50 N.Y.2d 183 (1980)
Guard-Life Corporation, Respondent,
v.
S. Parker Hardware Manufacturing Corp., Appellant.
Court of Appeals of the State of New York.
Argued February 11, 1980.
Decided May 1, 1980.
Leonard H. Moche, Harry A. Gottlieb and Glenn Backer for appellant.
Milton W. Levy and Arnold Bennett Glenn for respondent.
Judges JASEN, WACHTLER and MEYER concur with Judge JONES; Chief Judge COOKE dissents in part and votes to affirm in a separate opinion in which Judges GABRIELLI and FUCHSBERG concur.
*187 JONES, J.
As a general rule, if no improper means have been employed, a competitor may not be held liable for intentional interference with a contract that is unenforceable for lack of mutuality.
In January, 1968 plaintiff Guard-Life Corporation entered into a contract with Kokusan, a Japanese manufacturer of locks, which provided that Guard-Life would be Kokusan's exclusive distributor in the United States and Canada with respect to locks described in a schedule attached to the contract, production samples of which were to be subject to prior approval by Guard-Life. The contract had a stated term of five years and was thereafter "automatically [to] continue in force indefinitely" subject to the right of either party to terminate on one year's prior written notice. Guard-Life immediately placed an order (No. 1001) with Kokusan for 12 monthly shipments of Segal and National Type Locks, with shipment to begin on Guard-Life's approval of production samples. That approval was given on June 27, 1968, thus fixing the term of Order No. 1001 to expire on June 27, 1969. Order No. 1001 proved to be the only order ever to be placed by Guard-Life under its 1968 contract with Kokusan.
In the fall of 1968 defendant S. Parker Hardware Manufacturing Corp., a competitor of Guard-Life in the importation and wholesale distribution of various kinds of locks, initiated conversations with Katsura Company, Inc., of Japan, to establish a business relationship. (Solely for the purpose of the motion that is the subject of the present appeal, Parker accepts Guard-Life's contention that Parker's transactions with Katsura were the equivalent of doing business with Kokusan.) Parker was informed that Guard-Life's contract *188 with Kokusan would continue in effect until June, 1969 but that Kokusan did not intend to continue it thereafter and that it would cease supplying locks under that contract "to prove our faith to you". Parker's negotiations with Katsura resulted in the execution of a formal agreement between them, dated March 10, 1969, providing that Katsura would supply front door locks to Parker exclusively in accordance with conditions to be specified in Parker's orders. Two orders had already been placed by Parker on January 7, 1969, which included locks of the type included in Guard-Life's Order No. 1001, each requesting the prior submission of production samples to Parker for approval before manufacture. Parker's approval was not given until July, 1969 and delivery was not made to Parker until September, 1969.
Deliveries to Guard-Life by Kokusan under Order No. 1001 ceased in April, 1969. In September, 1969 Guard-Life instituted an arbitration proceeding against Kokusan in Japan which ultimately culminated in an award dated November 30, 1976. The arbitrators awarded Guard-Life damages of $75,529 plus interest, representing lost profits, for nondelivery by Kokusan of locks under Order No. 1001. No relief was granted, however, on Guard-Life's claim for alleged breach of the exclusive distributorship provisions of the 1968 contract, and the arbitrators further determined that the 1968 contract was not binding beyond Order No. 1001 because the parties had "an option of mutual cancellations" after the expiration of the term of that order on June 27, 1969. The motion papers do not disclose what part, if any, of the award has been collected by Guard-Life.
Guard-Life served the amended complaint in the present action against Parker in 1977, for willful interference by Parker with the 1968 contract between Guard-Life and Kokusan. After answer, Parker moved by order to show cause for a stay of trial and for complete and partial summary judgment. Supreme Court denied Parker's motion and on reargument adhered to its decision. The Appellate Division modified to the extent of granting partial summary judgment dismissing Guard-Life's claim for punitive damages (an issue not before us on this appeal) and as so modified affirmed the disposition of Supreme Court. It thereafter denied a motion for reargument but granted Parker leave to appeal to our court on a certified question as to the propriety of its order of modification. We now modify further to the extent of directing dismissal *189 of all Guard-Life's claims against Parker, except that for alleged tortious interference with Kokusan's performance under Order No. 1001.
Two closely related issues are posed on this appeal: May Parker be held liable to Guard-Life, on the theory of tortious interference with contract rights, first, for having induced Kokusan to cease deliveries on Order No. 1001 in April, 1969 (for which Kokusan was held liable to Guard-Life in the Japanese arbitration proceeding), and, second, for inducing Kokusan thereafter to terminate all contract relations with Guard-Life under their 1968 contract (for which Kokusan was not held liable to Guard-Life in the arbitration proceeding)? We conclude that, on the papers submitted on Parker's motion for summary judgment, it is not entitled to a dismissal with respect to the alleged interference with Order No. 1001, but that it is entitled to summary judgment with respect to all other claims based on alleged interference with the 1968 contract (CPLR 3212, subd [e]). Additionally, an order should be entered limiting any recovery by Guard-Life to no more than $75,529.
Before proceeding to evaluation of the proof tendered on the motion for summary judgment, it is necessary to state the law applicable to the disposition of Guard-Life's claims. With respect to the tort of interference with contract relations, it has been aptly said that "the law in this area has not fully congealed but is still in a formative stage" (Restatement, Torts 2d, ch 37, Introductory Note, p 5). That jurisdictions, and even courts within a single jurisdiction, have taken different views with respect to liability for interference with contract performance is demonstrated by the collection of cases appearing in a recent annotation treating only one aspect of the subject, interference with an invalid contract (Ann., 96 ALR3d 1294).
The American Law Institute in the Restatement of the Law of Torts 2d, adopted May, 1977, has stated the fundamental principle: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." (§ 766.) The keystone of the statement is the adverb "improperly"  a term selected in preference to the phrase "without justification" appearing frequently in *190 judicial decisions and giving rise to questions of burden of proof  the definition of which is inconstant and mutable, drawing its substance from the circumstances of the particular situation at hand. Section 767 of the Restatement sets out several factors for consideration in determining whether an intentional interference with a contract is "improper", accompanied by the observation that "[t]he issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation" (Comment b). Included among the factors to be considered are the nature of the conduct of the person who interferes (a chief factor in determining whether conduct is improper), the interest of the party being interfered with (whether in an enforceable contract or in a contract voidable and thus unenforceable or terminable at will),[1] and the relationship between the parties.[2]
Where the party claiming injury and the party charged with interference are business competitors  as are the parties to this action  there is presented a frequently encountered, particularized occasion for the application of the general principles as to liability for tortious interference with contract performance. Generalizations must be refined in this context to achieve a balancing of the protection of the interests of the one party in future enjoyment of contract performance and society's interest in respect for the integrity of contractual relationships, on the one hand, and, on the other, the right to freedom of action on the part of the party interfering and society's concern that competition not be unduly hampered. The Restatement in section 768 undertakes to articulate this balance. It differentiates between interference with an existing contract and interference with a prospective contractual relation (§ 768, Comment a). Although his status as a competitor does not protect the interferer from the consequences of *191 his interference with an existing contract, it may excuse him from the consequences of interference with prospective contractual relationships, where the interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful.[3] "Wrongful means" include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract (op. cit., § 768, Comment e; § 767, Comment c). The distinction thus made between the possible liability of a competitor for interference with performance of an existing contract and the more demanding requirements to establish liability for interference with prospective contractual relations reflects a recognition of the difference in the two situations in the relationship of the parties and in the substance and quality of their resulting interests; greater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer).
Critical to the determination of the second of the two issues in this case is whether a contract which is voidable for lack of mutuality is to be classified in the category of an existing contract or in that of a prospective contractual relation only. The Restatement (§ 768) expressly places a contract terminable at will in the latter category. Although the similarity *192 between voidable contracts and contracts terminable at will is elsewhere noted,[4] no explicit reference is made in section 768 to voidable contracts. It may be inferred that the reporter thought to classify voidable contracts with existing contracts or perhaps that voidable contracts were not to be classified at all for purposes of this section. For our part, however, we are persuaded that interference with performance of voidable contracts should be treated the same as interference with contracts terminable at will for purposes of imposing liability in tort, and that both fall in the same category with interference with prospective contractual relations. For present purposes there are only superficial distinctions between the rights and interests under contracts terminable at will and voidable contracts of the parties who claim to have been injured by the interference of the alleged tort-feasor. In both instances the contract will continue to be operational until action on the part of the other contracting party brings it to a halt, and in both instances the other party at his election may bring it abruptly to a halt, by termination in the one instance and by avoidance in the other.
It is not sufficient, we suggest, to make the result hinge on the subjective expectation or state of mind of the parties, as the dissenters appear to think appropriate. They would distinguish between contracts which are terminable at will and those which are voidable. The internalized expectation of the party seeking to recover for an alleged tort, however, may well be the same whichever the form of the contract. Thus, under a contract in form terminable at will, other factors may *193 give reliable assurance that there will likely be no exercise of the right of termination, accordingly fostering an expectation of future relations  a consequence the dissenters would ascribe to voidable contracts. By similar token, although their contract contains no right of termination, one party to a contract may be aware, as the result of legal advice or otherwise, that his contracting partner has an equivalent right to escape the obligation to perform because the contract is voidable, thus undermining any expectation of continuity  a consequence attributable by the dissent to a contract terminable at will.
Nor, although the dissenters appear to suggest otherwise, should the state of mind of the interfering tort-feasor be determinative. While it must be established, as a threshold predicate for any claim of tortious interference, that the alleged tort-feasor knew that his competitor had a contract with the third party, as a practical matter he will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract (as distinguished, perhaps, from its economic or operational aspects). He will seldom if ever know whether the third party has a right to terminate or is entitled to avoid the contract. To the extent that ethical considerations are urged by the dissenters as having a bearing, we perceive no difference in the ethical culpability, if any there be, of the uninformed, intentional interferer, whether it later turns out that the contract he interfered with was terminable at will, voidable, or indeed unquestionably enforceable. Yet the dissenters would deny relief in the first instance (absent fraud or other misconduct) but grant it in the latter two.
In sum, the imposition of liability for intentional interference with performance of a contract to which the competitor is a party must depend on the worth and significance of the objective interest to be protected. The actual, legal interest under a contract which may be avoided by the other contracting party at his election is not materially different from that under a contract which the other contracting party may terminate at will. In both instances the party seeking to impose liability enjoys no legally enforceable right to performance; his interest is a mere expectancy  a hope of future contractual relations. Consequently, there having been no trespass or invasion of a substantial legal interest, there is no liability for interference with performance of a competitor's *194 voidable contract absent employment of wrongful means, unlawful restraint of trade, or lack of competitive motive.
The principles embodied and the precepts set out in the Restatement and delineated above commend themselves in this developing area of the law and, in large measure, reflect prior case decisions in this jurisdiction. Thus, in Hornstein v Podwitz (254 N.Y. 443)  a case involving a contract neither voidable nor terminable at will  this court upheld a verdict for plaintiff in an action for inducement of breach of the contract on proof of the existence of a valid contract, defendant's intentional interference with performance and consequential damages suffered by plaintiff, a party to the contract. With respect to a contract for a definite term, persuasion to breach alone, as by an offer of better terms (Gold Medal Farms v Rutland County Co-op. Creamery, 9 AD2d 473), has been sufficient to impose liability on one who thereby interferes with performance (Gonzales v Reichenthaler, 233 N.Y. 607).
Where contracts terminable at will have been involved, we have upheld complaints and recoveries in actions seeking damages for interference when the alleged means employed by the one interfering were wrongful, as consisting of fraudulent representations (Rice v Manley, 66 N.Y. 82), or threats (Lurie v New Amsterdam Cas. Co., 270 N.Y. 379) or as in violation of a duty of fidelity owed to the plaintiff by the defendant by reason of a relation of confidence existing between them (A. S. Rampell, Inc. v Hyster Co., 3 N.Y.2d 369; Duane Jones Co. v Burke, 306 N.Y. 172). Absent some such misconduct, no liability has resulted to one whose actions have induced nonperformance of a contract deemed to be voidable and thus unenforceable (Livoti v Elston, 52 AD2d 444).
Against this background of the applicable principles of law, we proceed to consideration of Guard-Life's claims in this case.
From the several extended affidavits and documentary proof submitted on the motion for summary judgment, Guard-Life has demonstrated that Kokusan ceased deliveries in April, 1969, prior to completion of its performance under Order No. 1001. It also appears undisputed that Parker, through Katsura, began communications with Kokusan as early as the fall of 1968 looking to its replacement of Guard-Life at least in part as Kokusan's exclusive dealer in the United States and Canada. There is documentary and other evidence that Parker *195 knew of Guard-Life's 1968 contract with Kokusan. It is true that Katsura by letter dated January 18, 1969 stated that that contract "will last until the end of June this year" and that the seller was willing to terminate it on that occasion and had no intention to "renew" the contract. It is also true however that in that same letter it stated that it was going to cease supplying under that contract to demonstrate its faith to Parker. On March 10, 1969 a contract was entered into with Parker, granting Parker a worldwide exclusive distributorship, the contract to be "for a period of ten years from the date hereof", although deliveries were not to be made under the agreement until approval of production samples by Parker which did not occur until after the expiration of the one-year term of Order No. 1001. The record further discloses other communications between Parker and Katsura and Kokusan prior to the cessation by Kokusan of performance of its obligations under Order No. 1001 in April, 1969 and prior to the expiration of the 12-month period from June, 1968 fixed for delivery of merchandise included in that order. What significance is properly to be ascribed to these transactions and what inferences are to be drawn as to the part, if any, that they played in Kokusan's decision not to complete its obligations under Order No. 1001 involve factual determinations appropriately to be made after trial (Restatement, Torts 2d, § 766, Comment o). The fact, so heavily relied on by Parker, that performance under its contract with Katsura did not occur until after expiration of the delivery period under Order No. 1001 does not preclude a finding that Parker's conduct from the fall of 1968 through the spring of 1969 bore a causal relationship to Kokusan's default under Order No. 1001. Guard-Life's submission is adequate to require a trial of material issues of fact insofar as it claims tortious interference with that order and thus to defeat Parker's motion for summary judgment as to that aspect of the litigation.
The situation is otherwise, however, with respect to Guard-Life's claim based on alleged tortious interference by Parker in inducing Kokusan to abandon all performance under the 1968 contract after expiration of the term of Order No. 1001. The legal status of Order No. 1001 and that of the 1968 contract for the remainder of the five-year term alluded to in the agreement are significantly and critically different. While the former was an enforceable contract for a definite term, the remainder of the 1968 contract was held to be unenforceable *196 for lack of mutuality in the Japanese arbitration proceeding. Under familiar principles of issue preclusion, or collateral estoppel, Guard-Life is now bound by that determination. It did, as it could, agree to resolution of disputes arising under the contract by arbitration in Japan (Gilbert v Burnstine, 255 N.Y. 348); it fully participated in the arbitration proceeding and there litigated, unsuccessfully, its claim of nonperformance by Kokusan of a continuing obligation (beyond the obligation of delivery under Order No. 1001) under the contract; no assertion is now made that it was restricted or handicapped in presentation of its position, and it has formally admitted that the Japanese award has the effect of a judgment which is final and conclusive between the parties. In these circumstances, Guard-Life is bound by the arbitrators' determination as to unenforceability of the 1968 contract generally (Schwartz v Public Administrator of County of Bronx, 24 N.Y.2d 65; cf. Matter of American Ins. Co. [Messinger  Aetna Cas. & Sur. Co.], 43 N.Y.2d 184).
Moreover, inasmuch as the alleged interference on this branch of the case was with respect to an unenforceable contract, there is no liability in tort unless the means employed to effect the interference was wrongful;[5] mere knowing persuasion would not be sufficient. The evidence tendered by Guard-Life has been described in detail above. There was no proof tendered of any wrongful means  persuasion and offer of better terms, yes; fraud, misrepresentation, threats, other wrongful conduct, no. In sum, Guard-Life has made no submission sufficient to defeat Parker's motion for summary judgment with respect to alleged interference with the 1968 contract when Order No. 1001 is disregarded.
Finally, defendant Parker requests that it be granted partial summary judgment "limiting plaintiff's monetary claim against defendant". It contends that if plaintiff recovers at all its recovery should be limited either to $37,284, the amount of lost profits found by the arbitrators to have been sustained by reason of defendant's actual purchases of front door locks of the type covered by plaintiff's agreement with Kokusan, or to *197 $75,529, the total lost profits found by the arbitrators to have been sustained by plaintiff by reason of Kokusan's failure to fulfill Order No. 1001.
There is no merit to the claim that recovery should be limited to the first figure tendered, for if it should be determined on the trial of the action that defendant improperly interfered with Kokusan's performance with respect to Order No. 1001 then Guard-Life will be entitled not simply to lost profits attributable to the type of locks purchased by defendant Parker but to the full pecuniary loss of the benefits of the contract with which Parker interfered (Restatement, Torts 2d, § 774A, subd [1], par [a]). What other damages, if any, might be recovered in an action of this nature[6] we are not here required to determine, inasmuch as Guard-Life, by its bill of particulars, has limited its claim only to lost profits resulting from Parker's alleged interference. Because the determination by the arbitrators that with respect to Order No. 1001 those profits amounted to $75,529 is conclusive on Guard-Life  though of course not on Parker, a stranger to the arbitration process  it necessarily follows that an award to it on the trial of the action may not exceed that figure.[7] While a holding to the effect that a verdict may not be more than a stated amount does not lend itself to the form of an award of judgment on this motion for summary judgment, it may properly be included in an order aiding in the disposition of the action as authorized by CPLR 3212 (subd [g]).
For the reasons stated, the order of the Appellate Division should be modified, with costs, to the extent of remitting the case to Supreme Court, New York County, with directions to grant Parker's motion for summary judgment dismissing the complaint except with respect to Guard-Life's claim of tortious interference with Kokusan's performance under Order No. 1001 and to order that damages awarded to Guard-Life on *198 that claim may not exceed $75,529, and as so modified, affirmed.
Chief Judge COOKE (dissenting in part).
I dissent in part and vote that the order of the Appellate Division be affirmed.
It is agreed that summary judgment should be denied to plaintiff in respect to the claim of tortious interference with the order for locks, denominated as "Order No. 1001".
Issue, however, is taken with that portion of the majority's determination which grants summary judgment to defendant dismissing that part of the complaint relating to claims of tortious interference in respect to the underlying 1968 contract (apart from said numbered order). It is agreed that if that contract, granting Guard-Life an exclusive distributorship, was terminable at will, defendant's competitive interference would be justified (Restatement, Torts 2d, § 768; accord, e.g., Terry v Dairymen's League Co-Op. Assn., 2 AD2d 494, 500-501). The fact, however, is that the contract, though voidable, was for a definite term and prior to defendant's interference was being performed by the parties.[*] It was not terminable at will. Being such a contract, the rules governing tortious interference with voidable contracts should be applied here. The majority's failure to apply said rules is the touchstone from which this dissent springs.
It is undisputable that where an agreement is terminable at will, a competitor of one of the parties is free to use proper and legal means to induce termination (e.g., Terry v Dairymen's League Co-Op. Assn., 2 AD2d 494, supra; Restatement, Torts 2d, § 768; Prosser, Torts [4th ed], § 129, at p 946). This privilege of competition exists because the contracting parties have no contractual right to have their "relation continued, but only an expectancy" (Prosser, at p 946). Such an expectancy of future relations has, from early common-law days, always been subject to competitive interference (see, e.g., Mogul S. S. Co. v McGregor, Gow & Co., 23 QBD 598, affd [1892] AC 25).
But, for present purposes, a voidable contract with a prescribed duration simply is not akin to a contract terminable at *199 will. Indeed, the Restatement of Torts Second, heavily relied upon by the majority, treats the two types of agreements differently. According to the Restatement, "the fact that the contract is terminable at will * * * is a factor to be considered in some cases in determining whether the defendant is free to interfere (see § 768, Comment j)" (Restatement, Torts 2d, § 766, Comment g [Tent Draft No. 23]; emphasis added). With respect to voidable contracts, however, the Restatement provides that the existence of a formal defect does not justify interference "with performance of the contract before it is avoided" (Restatement, Torts 2d, § 766, Comment f). Moreover, section 768 of the Restatement, which deals with the privilege of competition, expressly states that competition provides no justification for interfering with an agreement, "if the contract is not terminable at will" (Restatement, Torts 2d, § 768, subd [2]).
There are sound reasons supporting the distinction drawn by the drafters of the Restatement. Significantly, the expectations of the parties to a voidable contract, which is for a prescribed duration, differ substantially from the expectations of parties to a terminable at will agreement. The latter are usually aware, when they enter into the contract, that their relationship is to continue only so long as is mutually agreeable, and hence will refrain from relying on the agreement in planning future transactions. Parties to a voidable contract, on the other hand, believe that they have established a relationship which will span a period of time and may order their future conduct accordingly. Indeed, since the formal defect which renders the agreement voidable  such as a failure to comply with the Statute of Frauds or technical rules relating to mutuality  often does not surface except as a post hoc defense to an action for breach, the fact that the agreement is voidable is of little practical significance. From a pragmatic standpoint, then, parties to such a voidable contract are in a situation akin to parties to an enforceable agreement with a fixed duration.
Moreover, the nature of the conduct of one who interferes with a voidable contract does not differ from that of the person who interferes with an enforceable contract. In both cases, the wrongdoer is aware of the existing contractual relation, and chooses to intentionally interfere with it. In both cases, the contracting parties are performing their agreement, and expect the relationship to continue for a set period of *200 time. And, in both cases the wrongdoer has violated "the ethical precept that one competitor must keep his hands off of the contracts of another" (Prosser, Torts [4th ed], § 129, p 945).
In fact, it is this ethical precept which, at bottom, is the raison d'etre of the law of interference with contractual relations. If society were interested only in fostering economic competition, the tort of contractual interference would never have developed. Rather, the law would have allowed business entities to engage in unfettered competition, and relegated injured parties to a breach of contract action. But this is not the path that has been followed.
Instead, the law has decided, long ago, that enforcement of certain market morals is a societal interest worthy of protection. When these fundamental precepts are violated, the law provides a remedy. And the remedy, in form a tort action, exceeds that which would be available in a contract action. One who induces a breach of contract is liable, not just for contractual damages, but for all damages legally caused by the wrong (Restatement, Torts 2d, § 774A, Comment c; majority opn, at p 197, n 6). The form of the action and the measure of damages signals that more than economic interests are being protected. Contrary to the majority opinion, then, the interests involved here are not solely protection of contract rights versus freedom to compete. Rather, society's weighty interest in insuring a minimum level of ethical behavior in the marketplace is directly implicated.
It becomes clear why voidable contracts must be distinguished from contracts terminable at will. When a competitor induces termination of a contract terminable at will, he commits no ethical violation, and does not produce a result contrary to the expectations of the parties. In such a situation, there is no basis for prohibiting competitive interference. By contrast, where a competitor induces a breach of a voidable contract, which was being performed and which was for a designated period, he not only violates an important ethical precept himself, but he induces the contracting party to abandon his ethical obligation to carry out the promise contained in the technically unenforceable agreement. In addition, since the parties did not intend to create a voidable contract, and were likely unaware of the defect, the interferer has upset their expectations.
Finally, the majority's suggestion that neither the subjective *201 expectations of the contracting parties nor the state of mind of the interferer are relevant factors is noted. It is precisely those factors which must be balanced in determining liability for interference with economic relations. As the Restatement puts it, "the plaintiff's interest in his contractual rights and expectancies must be weighed * * * against the defendant's interest in freedom of action". And, "the nature of [the interferer's] conduct is an important factor" (Restatement, Torts 2d, § 766, Comment c). Indeed, the subjective expectancies of the contracting party are a major reason for permitting competitive interference with contracts at will, while not allowing it when a durational contract exists. In the latter instance, "the greater definiteness of the [contracting party's] expectancy and [the] stronger claim to security for it" justify legal protection against interference (Restatement, Torts 2d, § 767, Comment e). In short, the subjective expectations of persons who enter into a contract are important considerations when evaluating whether a third party is free to interfere with the ongoing contractual relationship. A view that would make liability turn upon the circumstance that the contract might be voidable  without regard to the interests involved  would exalt form over substance.
To uphold contracting parties expectations, and to protect the society's interest in assuring a level of market morality, I would adopt the formulation of the Restatement, and hold that the privilege of competition only justifies interference with an at will and not a voidable contract.
Contrary to the implication of the majority, then, the wrongfulness of the act of the interferer in respect to a voidable contract need not rise above "intentional interference, without justification", with the contractual rights of another, with knowledge of the contract (see, e.g., Campbell v Gates, 236 N.Y. 457, 460). Accordingly, Guard-Life need only show that defendant intentionally interfered with its contractual rights, without justification and with knowledge of the contract to make out a cause of action. Having produced ample evidence in substantiation, but there being a true factual question as to the intentional interference, summary judgment should be denied in this respect.
Accordingly, affirmance is in order.
Order modified, with costs to defendant, and the case remitted to Supreme Court, New York County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed. Question certified answered in the negative.
NOTES
[1] The Restatement recognizes that these two types of contracts present similar situations. In each there is a valid and subsisting relation until opposition to enforcement is raised or termination is effected (Restatement, Torts 2d, § 766, Comments f, g).
[2] Other factors include the motive and interests sought to be advanced by the one who interferes, the social interests in protecting the freedom of action of that person as well as the contractual interests of the party interfered with, and the proximity or remoteness to the interference of the conduct complained of.
[3] Section 768 of Restatement, Torts 2d, provides:

"§ 768 Competition as Proper or Improper Interference
"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
"(a) The relation concerns a matter involved in the competition between the actor and the other and
"(b) the actor does not employ wrongful means and
"(c) his action does not create or continue an unlawful restraint of trade and
"(d) his purpose is at least in part to advance his interest in competing with the other.
"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."
[4] See footnote 1, supra. To describe these contracts as "existing" in the sense that they are conceptually in esse and form the predicate for enforceable obligations unless and until terminated or avoided does not advance our present analysis. In this sense contracts terminable at will and contracts which are voidable at the election of the party concerned are indistinguishable. The Comments of the Restatement with respect to contracts terminable at will would appear to be equally applicable to voidable contracts: "If the third person is free to terminate his contractual relation with the plaintiff when he chooses, there is still a subsisting contract relation; but any interference with it that induces its termination is primarily an interference with the future relation between the parties, and the plaintiff has no legal assurance of them. As for the future hopes he has no legal right but only an expectancy; and when the contract is terminated by the choice of the third person there is no breach of it. The competitor is therefore free, for his own competitive advantage, to obtain the future benefits for himself by causing the termination. Thus he may offer better contract terms, as by offering an employee of the plaintiff more money to work for him or by offering a seller higher prices for goods, and he may make use of persuasion or other suitable means, all without liability." (Op. cit., § 768, Comment i.)
[5] There is no suggestion that any of the other bases for liability as to an unenforceable contract set out in section 768 of the Restatement of Torts 2d  the relation concerns a matter not within the competition between the parties, the action complained of creates or continues an unlawful restraint of trade, or the purpose of the interference is other than to advance the competitive interest of the one interfering with performance of the contract  is applicable in the present case.
[6] On principle, the injured party in the action against the other contracting party for breach of contract would be limited to the elements of damage recoverable in a contract action. In an action against the third party for tortious interference, however, the elements of damages, including consequential damages, would be those recognized under the more liberal rules applicable to tort actions (Restatement, Torts 2d, § 774A, Comment c).
[7] Guard-Life concedes its willingness to give credit to Parker for whatever has been paid by Kokusan in satisfaction of the arbitration award. Whether Parker will assert any claim for additional credit for funds it may contend could have been collected by Guard-Life by recourse to reasonable collection methods remains to be seen when the action is tried.
[*] The contract was found to lack mutuality in a Japanese arbitration proceeding and plaintiff Guard-Life is bound by that determination. A contract may be voidable because of lack of mutuality (Restatement, Torts 2d, § 766, Comment f). The question whether the contract would be enforceable in New York need not be reached (see Prosser, Torts [4th ed], § 129, p 932).