**CENTRAL SPORTS ARMY CLUB
and National Association of
Army Sports, Plaintiffs,**

**v.**

**ARENA ASSOCIATES, INC., Detroit Vipers, International Hockey League, Athletes and Artists, Inc. and Jay Grossman, Defendants.**

**No. 96 Civ. 8681 (BSJ).**

United States District Court,
S.D. New York.

Jan. 20, 1997.

184

Alexander Berkovich, Berkovich and McMenamin, New York City, for plaintiffs.

## MEMORANDUM & ORDER

JONES, District Judge.

■ This case revolves around a star hockey player's attempt to sever ties with a Russian hockey team, and the team's attempt to check that move. Pending are two motions. Plaintiffs seek a preliminary injunction enjoining defendants[1] from employing the player and otherwise interfering with plaintiffs' contractual and business relationship with him.[2] The Detroit Vipers ("Vipers") and the International Hockey League ("IHL") cross-move to dismiss or to transfer venue.

For the following reasons, both motions are denied.

### BACKGROUND

Plaintiff Central Sports Army Club is a Russian hockey club owned and managed by plaintiff National Association of Army Sports (collectively, the "CSKA"). (Jlouktov Aff. II ¶ 1). The CSKA is known for developing some of the finest hockey players in the world. (Jlouktov Aff. I ¶ 2.)

Defendant Arena Associates, Inc. ("Arena") is the former name of Palace Sports & Entertainment, Inc. ("Palace Sports"), which is a Michigan corporation with corporate offices in Michigan. (Dudley Aff. ¶ 14.)

Palace Sports does business as a professional hockey team under the name of the "Detroit Vipers Hockey Club" (the "Vipers"), (id.), which is a named defendant in this case.

---

1. Defendants complain of the plaintiffs' failure to sue the hockey player in this action, noting that this case could severely impact the player's career. They do not claim, however, that the player is an indispensable party pursuant to Fed. R.Civ.P. 19. Plaintiffs respond that joinder of the Russian player would defeat diversity jurisdiction, as both the plaintiffs and the player hail from Russia, and that the player's interests are fully represented in this case given his apparent full cooperation with the defendants' lawyers. After considering these arguments, this Court adopts the reasoning of *Prof. Hockey Club Cent. Sports v. Det. Red Wings*, 787 F.Supp. 706 (E.D.Mich.1992), and finds that (1) the failure to join the player as a party will only slightly prejudice the player and the named parties and (2) the plaintiffs' interest in maintaining its cause before a federal court outweighs the player's interest in being a named party in this lawsuit. *See* Fed. R.Civ.P. 19(b).

2. Plaintiffs have not served defendant Jay Grossman, and thus do not seek injunctive relief against him individually. (*See* Berkovich Reply Decl. n. 1; Grossman Aff. n. 1.)

The Vipers are not a separate entity from Palace Sports. (Greenfield Aff. I ¶ 2.)

The Vipers play their home games in Michigan as a member of defendant International Hockey League ("IHL"). (*See generally* Dudley Aff.) The IHL is an American professional hockey league with over 20 teams hailing from various states. (Ufer Aff. I ¶ 6.) The IHL's president, Robert P. Ufer ("Ufer"), does not involve himself in or monitor contract negotiations between its member teams and prospective players. (Ufer Aff. I ¶ 2.)

Defendant Athletes and Artists, Inc. ("A & A") represents several athletes and television sports personalities. (Grossman Aff. ¶ 5.) A & A represented three prominent Russian hockey players in last year's National Hockey League draft. (*Id.* ¶ 7.) Jay Grossman ("Grossman") is A & A's Executive Vice President. (*Id.* ¶ 1.)

The hockey player at issue is Russian-born, eighteen year-old Sergei Samsonov ("Samsonov"). Since 1986, Samsonov has played hockey with the CSKA (Berkovich Decl. ¶ 6), developing into a player with the potential to dominate the game at its highest levels (*see generally* Berkovich Decl. Ex. B).

When he was only fifteen years old, Samsonov signed a contract to play with the CSKA. (Samsonov Aff. ¶ 4). According to Samsonov, he had no choice but to sign if he wanted to continue playing. (*Id.*) Samsonov's father, Victor Samsonov, neither signed nor approved the contract. (Victor Samsonov Aff. ¶ 4.)

When he was seventeen years old—on May 21, 1996, near the close of the 1995–1996 hockey season—Samsonov was asked to sign another contract (the "Player's Contract") relating to his playing hockey during the 1996–97 season in Russia's premier hockey league. (Samsonov Aff. ¶ 5.) Believing he had no other choice, he signed the paper. (*Id.*) Again, his father did not act as a co-signer. (Victor Samsonov Aff. ¶ 5.) Additionally, Samsonov's father claims that he did not approve of his son signing the Player's Contract. (*Id.*) However, Sergei Gimayev, a CSKA hockey coach, claims that Victor Samsonov expressly approved of the agreement. (Gimayev Aff. I ¶ 11; Gimayev Aff. II ¶ 2.)

The Player's Contract, which pertains to the hockey season lasting from June 1, 1996 through May 15, 1997, does not appear to be a full contract, but is styled as an "addendum to a contract." (*See* Berkovich Decl. Ex. C [the "Player's Contract"].) By its terms, it obligates Samsonov to play hockey for the CSKA in the "Russian premier league in the ice hockey Championship of the Russian Federation and the European Hockey League" during the 1996–1997 season. (*Id.*) Additionally, it requires the CSKA to compensate Samsonov $2,000 per month. (*Id.*) However, the CSKA did not pay Samsonov for each of the months he played under the contract. (*See* Samsonov Aff. ¶ 9; *see also* Jlouktov Aff. I ¶ 10.)

After the 1995–96 hockey season drew to a close, Samsonov learned that he would not be playing in Russia's premier hockey league, apparently because of a power struggle between competing CSKA coaches. (Samsonov Aff. ¶¶ 5–10; *see also* Victor Samsonov Aff. ¶¶ 5–9.) Failure to play in such a league at that time in his career, Samsonov believed, would have irreparably damaged his development as a player. (Samsonov Aff. ¶ 11.) This belief—combined with the CSKA's failure to compensate him fully under the Player's Contract—compelled Samsonov to decide by *July 1996* to leave the CSKA. (*Id.* ¶ 10; *see also* Victor Samsonov Aff. ¶ 10.)

When he resolved to leave Russia, Samsonov had not decided where he would play hockey during the 1996–1997 season. (*Id.*) So he could better make this decision, in early July 1996 Samsonov and his father met with Ilya Moliver ("Moliver"), a sports agent with A & A who speaks Russian. (Grossman Aff. ¶ 5.) Samsonov and his father told Moliver that they wished to engage A & A and that they were dissatisfied with their situation with the CSKA. (Moliver Aff. ¶ 4.) At the time, it was Moliver's understanding that Samsonov had signed the document with the CSKA while still seventeen years old, that his father had not signed, and that the document required the CSKA to play Samsonov in a premier league, which they were not doing at the time. (*Id.* ¶¶ 5–6.)

In early July 1996, Grossman agreed to represent Samsonov and began the task of finding him a place to play hockey for the 1996–1997 season. (Grossman Aff. ¶ 10.) As one of his first acts, Grossman helped secure Samsonov a Visa to enter the United States. (*See* Dudley Aff. Ex. 2.) It is uncontroverted that this Visa is dependent upon Samsonov's ability to play hockey in the United States. At the time, Grossman believed that any agreement Samsonov may have had with CSKA was either invalid or had been breached by CSKA. (*Id.*)

In August 1996, the *Detroit Free Press* reported that Samsonov had been released from any commitments he might have had to play hockey in Russia. (Dudley Aff. ¶ 6 & Ex. 3.) That same month, Richard C. Dudley ("Dudley"), the general manager of the Vipers, became aware of Samsonov's availability to play in the United States. (Dudley Aff. ¶ 3.) At the time, Dudley understood that no prior contractual obligations prevented Samsonov from contracting with the Vipers. (*Id.* ¶ 4.) There is no evidence, however, that Dudley contacted the CSKA concerning Samsonov.

On August 22, 1996, Samsonov signed with the Vipers for the 1996–97 season. (Dudley Aff. ¶ 7 & Ex. 1.) The team immediately began relying upon him as their marquee player, advertising him as "The Greatest Russian Ever." (*See* Dudley Aff. Ex. 4.) Until this time, Ufer, the president of the IHL, had no awareness that Samsonov was negotiating with any IHL team. (Ufer Aff. I ¶ 2.)

By letter dated September 16, 1996, plaintiffs' lawyer informed Dudley and Ufer that Samsonov was under contract with the CSKA for the 1996–97 season. (*See* Dudley Aff. ¶ 8; Ufer Aff. I ¶ 3 & Ex. 1.) Additionally, by letter dated September 20, 1996, the Russian Ice Hockey Federation ("RIHF") informed Ufer that Samsonov was under contract with the CSKA and had not released him from any obligation to play for it. (*See* Berkovich Decl. Ex. F.; Ufer Aff. I ¶¶ 2–3.) Both the Vipers and Ufer requested a copy

of the contract and legal authority supporting the Russians' claim. (Dudley Aff. ¶ 9; Ufer Aff. I ¶ 3.) CSKA's counsel supplied the Vipers with a copy of the Player's Contract, but never sent further correspondence to Ufer. (Dudley Aff. ¶¶ 9–11; Ufer Aff. I ¶ 4.) The Vipers responded by sending to plaintiffs' lawyer letters stating (1) that they understood Samsonov to have been released from any obligations he had with his former team and (2) that they believed the that the alleged contract was voidable. (Dudley Aff. ¶ 10 & Exs. 7 & 8.)

Meanwhile, Samsonov continued playing for the Vipers, becoming the top rookie scorer in the IHL. (Dudley Aff. ¶ 12, Ex. 4.) According to newspaper accounts submitted by the parties, Samsonov's talents have impressed the hockey world so much that he is now projected to be one of the top picks in the 1997 National Hockey League ("NHL") draft. (*See Id.* Ex. 4; Berkovich Decl. Ex. B.) This could translate into a multi-year contract worth millions of dollars and the opportunity to earn more in the future. (Grossman Aff. ¶ 13.) If Samsonov returns to Russia, however, he will most likely be inducted into the Russian military, postponing indefinitely any chance to play in the NHL. (*See* Samsonov Aff. ¶ 11; Victor Samsonov Aff. ¶ 11.)

On November 18, 1996, plaintiffs initiated this lawsuit, alleging, *inter alia*, that defendants tortiously interfered with their business and contractual relationship with Samsonov and engaged in a conspiracy to interfere with these relationships.[3] Additionally, plaintiffs claim that defendants Arena and the Vipers wrongfully converted and misappropriated CSKA's rights to Samsonov's services.

Despite the allegations contained in this case, the RIHF by letter dated November 20, 1996 sent to Dudley an invitation asking "the player from your club Sergei Samsonov" to play on Russia's National Team in the World Junior Championship tournament, which was scheduled to take place in Switzerland in late December 1996 and early Janu-

---

**3.** Plaintiffs also allege a tort styled as "Loss of Business, Profit and Good Will" against all defendants. (Compl. ¶¶ 101–107.) The Complaint reveals, however, that this tort merely restates plaintiffs' tortious interference claim. (*See id.*)

ary 1997. (Dudley Aff. Ex. 10.) The Vipers ultimately agreed to the request. (*Id.* ¶ 13.)

## DISCUSSION

### I. MOTION TO DISMISS OR TO TRANSFER

Defendants Vipers and the IHL move to dismiss the complaint as against them pursuant (1) to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction and (2) to Fed.R.Civ.P. 12(b)(3) for improper venue. Alternatively, they argue that even if venue is proper, 28 U.S.C. § 1404(a) mandates that the action be transferred to the Eastern District of Michigan.

### A. Personal Jurisdiction

■ As this Court sits in diversity, it engages in a two-part inquiry in order to resolve the question of personal jurisdiction: (1) Have the plaintiffs shown that the defendant is amenable to service of process under New York state law?; and (2) Would this Court's assertion of jurisdiction under New York law comport with the requirements of due process? *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996).

■ Where discovery has yet to commence, the plaintiff may convince a court to answer both questions affirmatively with allegations—as opposed to factually supported showings—sufficient to support jurisdiction. *Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990). In this connection, the court interprets the pleadings and affidavits in the light most favorable to the plaintiffs. *CT Chem. (USA) Inc. v. Horizons Int'l, Inc.,* 106 F.R.D. 518, 519 (S.D.N.Y.1985).

■ Under New York law, a single transaction of business occurring in New York and out of which the claim has arisen may be sufficient for long arm jurisdiction. N.Y.C.P.L.R. 302(a)(1) (McKinney 1990); *see also Premier Lending Services, Inc. v. J.L.J. Assocs.,* 924 F.Supp. 13, 15 (S.D.N.Y.1996). Such a business transaction includes a con-

tract negotiation indicating a party's "purposeful invocation" of the laws of New York State. *Premier Lending Services, Inc.,* 924 F.Supp. at 15; *Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.,* 15 N.Y.2d 443, 261 N.Y.S.2d 8, 14, 209 N.E.2d 68, *cert. denied,* 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965).

■ Additionally, a court may exercise personal jurisdiction over a foreign corporation if that corporation is "present" in the state. N.Y.C.P.L.R. § 301 (McKinney 1990); *En Vogue v. UK Optical Ltd.,* 843 F.Supp. 838, 842 (E.D.N.Y.1994) (citing *Frummer v. Hilton Hotels, Intern., Inc.,* 19 N.Y.2d 533, 281 N.Y.S.2d 41, 227 N.E.2d 851 (Ct.App.), *cert. denied,* 389 U.S. 923, 88 S.Ct. 241, 19 L.Ed.2d 266 (1967)). A party is "present" in New York if it "does business" here, which connotes a "continuous and systematic course of business" in the state. *En Vogue,* 843 F.Supp. at 842.

■ In any case, due process requires that a defendant's contacts with New York "be such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *En Vogue,* 843 F.Supp. at 844 (quoting *International Shoe Co. v. State of Washington, Office of Unemployment Compensation and Placement et al.,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). Such concerns are satisfied where the defendant's activities constitute purposeful efforts to invoke the benefits and protections of New York law. *First City Federal Savings Bank v. Dennis,* 680 F.Supp. 579, 584 (S.D.N.Y.1988); *see also Asahi Metal Ind. Co. v. Superior Court,* 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (defendant need not have been present physically in the forum state for due process to be satisfied).

■ Here, plaintiffs allege sufficient facts for the Court to exercise personal jurisdiction over both the Vipers and the IHL. With respect to the Vipers, plaintiffs allege that the "center of gravity" of the transaction concluding in Samsonov's decision to sign with the Vipers was in New York. (*See* Berkovich Reply Decl. ¶ 44.) Indeed, Grossman and A & A operate out of New York,

and it was they who shopped Samsonov around attempting to find him a suitable American team on which he could play. That the Vipers generally play their home games in Michigan is of no moment as plaintiffs allege that the actual agreement resulting in Samsonov's decision to play for the team was negotiated in New York. Similarly, the fact that a Vipers' representative may never have physically visited New York to consummate the agreement is inapposite. *See ParkeBernet, CT Chemical (USA), Inc. v. Horizons Int'l, Inc.*, 106 F.R.D. 518, 519–21 (S.D.N.Y. 1985) (finding personal jurisdiction over defendant that injected itself into New York by means of mail and telephone contacts). Thus, based on plaintiffs' allegations, the Court finds that maintenance of this action does not offend traditional notions of fair play and substantial justice, and that the Vipers are amenable to personal jurisdiction.

█ With respect to the IHL, plaintiffs claim that six out of the league's 20 teams are farm clubs of various NHL organizations, including the New York Islanders (which has offices located in Uniondale, New York). (Berkovich Reply Decl. ¶¶ 38–39.) Additionally, they claim that the NHL is headquartered in New York City and that many IHL players are under contract with NHL teams. (*Id.*) Lastly, they state that the IHL and some of its member clubs market team logos on goods sold in New York City and that the IHL deals with cable networks in New York City that broadcast IHL games in New York and elsewhere. (*Id.* ¶ 39.) Based on these allegations—and despite Ufer's allegations that the NHL is headquartered in Toronto, Canada and his statement that the IHL does not have agreements with *specific* cable networks (*see* Ufer Aff. II ¶ 5)—it is reasonable to conclude that the IHL regularly conducts business in New York City with the NHL, various sports marketers, and cable companies. Thus, the Court finds that the IHL has a "presence" in this state and that mainte-

nance of this action does not offend traditional notions of fair play and substantial justice. Accordingly, the IHL is subject to personal jurisdiction in this action.

**B. Venue**

█ Defendants Vipers and IHL move to dismiss the complaint against them for improper venue under 28 U.S.C. § 1391(a).[4] Where venue is challenged, it is the plaintiff's burden to prove that it is proper. *Saferstein v. Paul, Mardinly, Durham, James, Flandreau & Rodger, P.C.*, 927 F.Supp. 731, 735 (S.D.N.Y.1996). To do so, the plaintiffs must show that the chosen forum lies in the district in which a substantial part of the events giving rise to the claim occurred. 28 U.S.C. § 1391(a)(2); *Leucadia National Corp. v. FPL Group Capital*, 93 Civ. 2908, 1993 WL 464691, *5 (S.D.N.Y. Nov. 9, 1993). Alternatively, plaintiffs can show that further discovery will reveal that this is the case. *Cf. Gaines, Emhof, Metzler & Kriner v. Nisberg*, 843 F.Supp. 851, 854 (W.D.N.Y.1994) (where plaintiff cannot show that further discovery would reveal sufficient contacts with chosen forum, venue is improper).

Here, plaintiffs have shown that a substantial part of the events giving rise to their claims occurred in New York. In fact, the parties most responsible for consummating Samsonov's deal with the Vipers—namely Samsonov's agents, Grossman and A & A—are headquartered in New York. There is no indication that the events leading up to the signing took place outside of New York. Rather, plaintiffs have tendered sufficient evidence to suggest that discovery will reveal that Grossman operated out of his New York office in brokering Samsonov's arrangement with the Vipers. Thus, the Court finds that venue is proper.

---

4. 28 U.S.C. § 1391(a) provides in relevant part: A civil Action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same state, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ... or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

## C. Transfer

 The Vipers and the IHL argue that if the Court finds venue proper, then it should transfer this action to the Eastern District of Michigan pursuant to 28 U.S.C. § 1404(a).[5] The purpose of section 1404 is to prevent waste of time, energy, and money, and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense. *Van Dusen v. Barrack,* 376 U.S. 612, 615, 84 S.Ct. 805, 808–09, 11 L.Ed.2d 945 (1964). It does not, however, defeat a plaintiff's right to bring an action in the forum of its choice. *See H.L. Green Co. v. MacMahon,* 312 F.2d 650, 652 (2d Cir.1962), *cert denied,* 372 U.S. 928, 83 S.Ct. 876, 9 L.Ed.2d 736 (1963). Thus, courts ought to give due consideration to a plaintiff's choice of forum. *See Seiko Time Corp. v. Pascual,* 117 F.R.D. 354, 358 (S.D.N.Y.1987). Indeed, courts in this circuit are loath to disturb a plaintiff's choice of forum absent a showing that "the balance of convenience and justice weighs heavily in the favor of transfer." *Somerville v. Major Exploration, Inc.,* 576 F.Supp. 902, 908 (S.D.N.Y.1983).

While this case could have been filed in the Eastern District of Michigan, transfer would merely serve to shift the inconveniences from the Vipers and the IHL to the other parties in the case. *See Seiko Time Corp.,* 117 F.R.D. at 358 (change of venue that would simply shift inconvenience from defendant to plaintiff does not defeat plaintiff's choice of forum). As stated, a substantial part of the events underlying this action occurred in New York, and thus it is likely that this forum will also serve as a locus of operative facts and witnesses. In fact, defendants Grossman and A & A are located in New York and there is no indication that witnesses now located in Michigan would be unable or unwilling to testify in New York.[6]

Additionally, plaintiffs are Russian organizations with lesser means than the IHL and the Vipers. In this connection, it would be easier for plaintiffs and their Russian witnesses to travel from Russia to New York than from Russia to Detroit, while representatives from the Vipers and the IHL can easily travel from Detroit to New York. Further, Viktor Jlouktov, the president of the CSKA's hockey club, states that their current attorney is essential to plaintiffs' representation. This attorney, who speaks fluent Russian and is familiar with the issues surrounding professional hockey, is located in New York and informed the Court that the CSKA cannot afford to retain both him and Michigan counsel. All of these factors lead to the conclusion that it would cause the plaintiffs great hardship to continue this action in Michigan.[7]

Moreover, Russian law will likely dominate much of this case. Thus, it cannot be said that the Michigan court is more familiar with the law to be applied.

For these reasons, this Court finds that defendants Vipers and the IHL have failed to show that the Eastern District of Michigan would be a more suitable venue in which to try this action. Accordingly, the Court proceeds to discuss the merits of plaintiffs' motion for a preliminary injunction.

## II. MOTION FOR INJUNCTIVE RELIEF

 Plaintiffs ask the Court to enjoin defendants from employing Samsonov and interfering with their business and contractual relationship with him. A court may grant a preliminary injunction only upon the movant's showing of:

(a) irreparable harm; and (b) either (1) likelihood of success on the merits or (2)

---

**5.** 28 U.S.C. § 1404(a) provides:
For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

**6.** It is uncertain where Samsonov—perhaps the case's most important witness—will be when his testimony is required. Although the Vipers play their home games in Michigan, they travel to compete against teams from around the country.

Additionally, he is projected to be drafted by an NHL team this summer, and thus could soon reside anywhere from Los Angeles to New York.

**7.** *Cf. Vaughn v. American Basketball Ass'n,* 419 F.Supp. 1274, 1277 (S.D.N.Y.1976) (granting transfer where plaintiff's New York attorney, who also served as plaintiff's agent, failed to allege that transfer would accord the plaintiff difficulty in retaining representation).

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Blum v. Schlegel,* 18 F.3d 1005, 1010 (2d Cir.1994); *accord Baker's Aid v. Hussmann Foodservice Corp.,* 830 F.2d 13, 15 (2d Cir. 1987); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979); *see also Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 273 (2d Cir.1986).

### A. Likelihood of Success or Sufficiently Serious Questions Going to the Merits

Plaintiffs claims are based largely on the contention that the defendants tortiously interfered with the Player's Contract and their business relationship with him.[8]

■■■ Since Samsonov signed the Player's Contract before he turned eighteen years old, the agreement is voidable.[9] Under New York Law, there is no liability for interference with such an agreement absent employment of wrongful means, unlawful restraint of trade, or lack of competitive motive. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 633–34, 406 N.E.2d 445, 450–51 (Ct.App.1980); *Michael J. Taub v. Amana Imports, Inc.,* 140 A.D.2d 687, 528 N.Y.S.2d 884, 885 (1988). Similarly, the tort of intentional interference with non-contractual relations "must be effected by unlawful means or, under the theory of *prima facie* tort, by lawful means without justification." *Quail*

*Ridge Assocs. v. Chemical Bank,* 162 A.D.2d 917, 558 N.Y.S.2d 655, 658 (New York law), *appeal dismissed,* 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (Ct.App.1990); *accord BPS Clinical Laboratories v. Blue Cross and Blue Shield of Michigan,* 217 Mich.App. 687, 552 N.W.2d 919, 925 (1996) (Michigan law) (requiring unlawful means).[10]

The CSKA, however, has not demonstrated that the defendants acted with "wrongful means" or without justification. Indeed, nothing shows that these defendants acted in an unlawful, unethical, unfair, dishonest, or fraudulent manner. Rather, all their actions were undertaken with the justifiable business motive of securing a business asset—in this case, a star hockey player. Specifically, the evidence does not suggest that Grossman and A & A surreptitiously sought to steal the Russian athlete from the CSKA, but shows that they acted only after Samsonov and his father engaged their agency with intent to enter the American hockey world. Similarly, Arena and the Vipers did not engage in any improper conduct when signing Samsonov, but understood that he was free from other obligations. Lastly, there is no evidence that the IHL acted at all, let alone with unlawful means, with regard to Samsonov's signing with the Vipers. Accordingly, the CSKA has not shown a likelihood of success or sufficiently serious questions going to the merits of its claims.

■■■ Moreover, even assuming, *arguendo,* that the Player's Contract is not

---

**8.** Plaintiffs also claim that defendants' actions violate the International Ice Hockey Federation's ("IIHF") rules regarding transfer of international players. However, neither the Vipers nor the IHL are members of the IIHF, and thus those rules do not apply here. (*See* Ufer Aff. II ¶ 2; Greenfield Aff. ¶ 8.) This Court expresses no opinion on whether the rules may effect Samsonov's planned move to NHL next year.

**9.** The Court credits the submissions of Michael Solton, the defendants' expert on Russian law, for the proposition that Russia's Civil Code governs the Player's Contract. *See* Fed.R.Civ.P. 44.1; (Solton Aff. II ¶ 5). That code states that contracts in which a person under eighteen years old is a signing party are voidable at the option of the minor unless the minor obtained the express written consent of his parents or guardian. (Solton Aff. I ¶ 4; Solton Aff. II ¶ 6.) Parentheti-

cally, the same rule obtains under New York and Michigan law. *See* N.Y.Gen.Oblig.Law § 3–101 (McKinney 1989); Mich.Comp.Laws Ann. § 722.52 (West 1996). Accordingly, since Samsonov signed the Player's Contract when he was 17 years old without the appropriate parental consent, the agreement is a voidable contract.

**10.** *See also Lunsford v. Farrell Shipping Lines, Inc.,* 83 Civ. 7642, 1991 WL 150596, *8 (S.D.N.Y. July 26, 1991) (requiring improper intent or "means that are dishonest, unfair or in any other way improper"); *Bonelli v. Volkswagen of Am.,* 166 Mich.App. 483, 421 N.W.2d 213, 219–220 (1988) (Michigan law) (requiring unlawful means); *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1987) (stating that acts of interference, if lawful, must be motivated solely by "malice or ill-will and exceed the bounds of legitimate, robust competition").

voidable, the plaintiffs' claims fail. In order to prove tortious interference with contract, a party must establish (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional inducement of the third party to breach that contract, and (4) damages. *Kronos Inc. v. AVX Corp.*, 81 N.Y.2d 90, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (Ct.App.1993) (New York law); *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich.App. 361, 354 N.W.2d 341, 346 (1984) (Michigan law). In addition, the party must show that the motive for the interference was "improper." *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 428 N.Y.S.2d 628, 632 & n. 2, 406 N.E.2d 445, 449 & n. 2 (Ct.App.1980) (New York law); *Trepel*, 354 N.W.2d at 346 (Michigan law).[11]

■ Similarly, in order to prove an intentional interference with a non-contractual business relationship, a party must establish (1) the existence of a valid business relation, (2) the defendant's knowledge of that relationship, (3) the defendant's intentional interference inducing or causing a termination of that relationship, and (4) damages. *See Volvo North Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 74 (2d Cir.1988) (New York law); *Bonelli v. Volkswagen of Am.*, 166 Mich.App. 483, 421 N.W.2d 213, 219 (1988) (Michigan law) (quoting 45 Am.Jur.2d § 50); *Sommer v. Kaufman*, 59 A.D.2d 843, 399 N.Y.S.2d 7, 8 (1977) (New York law).

The facts on this record simply do not support either claim.

**11.** *See also M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.*, 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (1995) (New York law) (stating that in order to commit tort of *intentional interference with contract*, one's motive must be "solely malicious").

**12.** The defendants suggest that the Player's Contract is an invalid agreement. In this connection, they state that the contract is one of adhesion imposed under a monopolistic hockey system in which contracts are not negotiated between the team and player, but dictated by the CSKA to the player. *See In re Apollo Air Passenger Computer Reservation System*, 720 F.Supp. 1061, 1064 (S.D.N.Y.1989) (discussing contracts of adhesion). Additionally, they claim

### 1. No inducement

Most glaringly, the CSKA has failed to establish that the defendants induced Samsonov to breach the Player's Contract or his business relationship with the CSKA. First, with regard to the IHL, there is no evidence whatsoever showing that the IHL was involved in either Samsonov's decision to leave Russia, his relationship with A & A or Grossman, or his signing with the Vipers. Second, the defendants came into contact with Samsonov *after* he and his father decided to leave Russia so that Samsonov could play hockey elsewhere. To the extent Samsonov's decision to play in the United States compelled him to breach the Player's Contract [12] or to sever his business ties with the CSKA, it did so before he contacted the defendants. Accordingly, the most that can be said is that the defendants facilitated his entry into the American hockey scene, not that they induced him to leave his Russian team.

### 2. No awareness of contractual obligations

Additionally, the CSKA has not shown that the defendants knew Samsonov was under any obligation with the CSKA when they acted in regard to him. When Moliver and Grossman met Samsonov, they believed that the CSKA was in breach of its agreement with Samsonov due to the failure to play him in a "premier league." Additionally, the Vipers signed Samsonov on the assumption that he had been released from any contractual obligations he might have had in Russia. Similarly, there is no evidence that any IHL representative knew that Samsonov had

that the CSKA materially breached the agreement by failing to play Samsonov in a Russian premier league. Further, the defendants complain that the CSKA has produced only an addendum to a contract—and not a complete contract—thus preventing them from fully analyzing the validity and terms of the agreement. The plaintiffs respond that Samsonov could have signed with any club in the world, but chose the CSKA, and that he left for the United States before he could play in Russia's premier league. Additionally, plaintiffs insist that the addendum produced is the full contract at issue. Given the Court's analysis, resolution of these issues is unnecessary at this time. Accordingly, the Court declines to consider them.

signed with the CSKA before plaintiffs' lawyer informed Ufer of such—which occurred in September, 1996, the month *after* Samsonov signed with the Vipers.

### 3. *No improper motive*

The CSKA also has failed to establish that any of the defendants involved in Samsonov's signing with the Vipers acted with "improper" motive or without legitimate justification. In this connection, there is no evidence showing that these defendants sought to destroy the CSKA or acted with malicious or even indecorous intent. Rather, they sought to promote their legitimate business interests; Grossman and A & A sought to secure a profitable client, while the Vipers and Arena sought to sign a star athlete who will help attract fans and win games. Moreover, the mere making of an offer to Samsonov, absent any indication that the defendants thought he was not free to leave the CSKA, is not an actionable tort. *See Triangle Film v. Artcraft Pictures,* 250 F. 981, 982 (2d Cir.1918) (Hand, L.J.).[13]

### CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss and, alternatively, to transfer venue is denied. Additionally, the plaintiffs' motion for preliminary relief is denied. The parties are directed to appear for a pretrial scheduling conference on January 24, 1997 at 10:00 a.m. in Courtroom 618 to discuss the further conduct in this case.

---

**13.** For essentially the same reasons, the Court finds that plaintiffs also have failed to demonstrate a likelihood of success or sufficiently serious questions on the merits of its claims for conversion, misappropriation, and conspiracy. In this connection there is no proof that the defendants acted to convert Samsonov's services to their own, took his services knowing him to be under contract with the CSKA, or conspired to commit either act. *See Key Bank of N.Y. v. Grossi,* 642 N.Y.S.2d 403, 404 (App.Div.1996) (discussing conversion under New York law); *Rohe Scientific Corp. v. National Bank of Detroit,* 133 Mich.App. 462, 350 N.W.2d 280, 281 (1983) (discussing conversion under Michigan law); W. Page Keeton et al., Prosser and Keeton on Torts § 130, at 1020–23 (5th ed. 1984) (discussing misappropriation).