UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2003

(Argued: September 4, 2003
          Questions Certified to the New York Court of Appeals:    November 21, 2003

Docket Nos. 02-9246, 02-9248, 02-9252, 02-9362

_____

CARVEL CORPORATION,

*Plaintiff-Counterclaim-Defendant-Appellant*,

— v. —

ELIZABETH A. NOONAN, JOHN D. NOONAN,
PETER MARSELLA and JOSEPH A. GIAMPAPA,

*Defendants-Counterclaim-Plaintiffs-Appellees*,

ABDUL AZIZ HOODBHOY, JOHN K. HAZELTON, MARY LISA HAZELTON,
EDWARD GROMELSKI, MARCIA FINKLE, NELSON FINKLE, SULEMAN
HOODBHOY, DOST M. KHEMANI, JOHN G. HUGHES, BEVERLY A. PAPP;
ROBERT A. MORATH; IQBAL NAVIWALA; ESTELLE MCNERNEY; PEN LI
WANG; STANLEY SICINSKI; JOSEPHINE INGENITO; ANGELA
SPARACINO; GASPARE SPARACINO; JEROME LANG; MARGARET C. LANG;
NASIM ARHSED CHUGTAI; ROBERT SPIELMAN; JOSEPH A. ROTONDO;
PAULA ROTONDO; VALERIE CRISTIANO; STEPHEN W. VANGELDER;
MILDRED MILLER; DORA LEE SHOCK; BRUCE MORDAUNT; ROSEMARIE
MORDAUNT; JOHN F. SCHNEIDER; JOSEPHINE ANN SCHNEIDER;
CARLTON K. HARDING; JUDITH M. HARDING; ANTHONY IAQUINTA;
FRANK IAQUINTA, MD; KENNETH MOUNTS; SHIRLEY MOUNTS; BURTON
G. FISCHER; LYNN KOHLER; DON ROGGIE SICLAIT; WILFRID
SICLAIT; ISMAIL TAWFIK; NOOR J. TAWFIK; RANDY HYDE; ROBERT
NOORIGIAN; STEPHEN KWACZ; ASH FAMILY TRUST; CHRISTEL
SICINSKI; MARIA CAPODIECI; GERALDINE MCCORMACK; VINCENT

1

VALVA, SR.; JERRY CAPODIECI; CAROL GUADAGNO; CHIN TIEN HSIEH; MARGARET Y.M. HSIEH; SUE TSING HSIEH; DIANE HUMPHREY; ROBERT KOHLER; CHRISTINE LIBERTI; HUGO LIBERTI; MARY H. LISA; ROBERT T. MAIDA; JEANNE V. MARSELLA; EDWARD MCCORMACK; GEORGE M. PIQUETTE, JR.; KETKI P. SHAH; PANKAJ SHAH; DOUGLAS CASAVANT; BARBARA CASAVANT; JOHN LYNCH; CATHERINE LYNCH; H. MARTIN POPIEL; JOYCE POPIEL; ARMOND LIGUONI; HENRY GOLDMAN; RICHARD HARRIS, Dr.; MICHAEL BAILEY; DENISE BAILEY; JOAN NOORIGAN; JAMES BAKER;

*Defendants-Counterclaim-Plaintiffs.*

LOUIS R. PEPE and ERNEST J. MATTIE,

*Special Masters.*

_____

Before:

NEWMAN, SOTOMAYOR, and WESLEY, *Circuit Judges.*

_____

Appeal from the judgment of the United States District Court for the District of Connecticut (Covello, *Chief Judge*), entered on October 22, 2002, on jury verdicts in favor of appellees on their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional interference with prospective economic relations.

Questions certified to the New York Court of Appeals.

_____

MITCHELL A. KARLAN, ESQ., Gibson, Dunn & Crutcher LLP (Marshall King, David Arroyo, Michelle Craven, *of counsel*), New York, NY, *for Plaintiff-Counterclaim-Defendant-Appellant.*

J. MANLY PARKS, ESQ., Duane Morris LLP (Aegis J. Frumento, *on the brief*, Wayne A. Macks, Jr., James H. Steigerwald, Shannon Hampton

Sutherland, *of counsel*), Philadelphia, PA, *for Defendants-Counterclaim-Plaintiffs-Appellees.*

—————————————

WESLEY, *Circuit Judge*:

This is an appeal from a judgment of the United States District Court for the District of Connecticut (Covello, *Chief Judge*), entered on jury verdicts in three separate trials in favor of appellees on their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional interference with prospective economic relations. Appellees – the Noonans (hereinafter "Noonan"), Marsella, and Giampapa – were once franchisees of appellant Carvel Corporation ("Carvel"); the events underlying this litigation occurred while Carvel and appellees were, respectively, franchisor and franchisees. In this appeal, Carvel presents six contentions in seeking a reversal, however only two require our current attention. First, Carvel argues that the district court erred in denying its renewed motion for judgment as a matter of law on appellees' claims that Carvel tortiously interfered with their prospective economic relations with their retail customers. Second, Carvel argues that the district court erred in permitting the juries in appellees' trials to assess punitive damages against Carvel.[1]

Because there is no controlling New York case law, we certify to the New York Court of Appeals questions as to the standard by which we should evaluate Carvel's conduct for purposes of imposing liability for tortious interference, and as to whether punitive damages may be awarded in this type of case. Answers to these questions will determine whether we will reach

---

[1] Carvel also argues that the district court erred in denying its renewed motion for judgment as a matter of law on appellees' claims that Carvel breached an implied covenant of good faith and fair dealing in the franchise agreements; that the district court erred in submitting Noonan's and Marsella's claims of breach of contract to their respective juries; and that the district court erred in entering judgment on appellees' jury verdicts, because appellees used the wrong measure of damages and did not prove compensatory damages with reasonable certainty.

the remaining contract issues. We will retain jurisdiction so that, following the New York court's responses, we may resolve any issues that remain and dispose of the appeal.

## I.      Background Facts

Appellant Carvel, owner of various brand names, trademarks, and recipes for the production of ice cream products, entered into numerous franchise agreements under which franchisees obtained the right to do business under the name "Carvel" and to manufacture and sell Carvel products in retail stores. All of Carvel's franchise agreements ("the agreements") provide that their construction and performance shall be governed by the law of the State of New York; no party contests that choice of law.[2] Under the agreements, franchisees were permitted to sell Carvel products at specified off-site locations such as restaurants, schools, and hospitals. However, franchisees were not permitted to sell Carvel products to anyone other than ultimate consumers; they were not, for example, permitted to wholesale their products to supermarkets. In the early 1990's, Carvel began selling its products through supermarkets. Appellees claim that Carvel's distribution of its products through supermarkets violated the terms and spirit of their franchise agreements.

### A.      Carvel's Distribution Through Franchises

Historically, Carvel distributed its products solely through franchise retail stores. The "Acknowledgments" paragraph in Carvel franchise agreements noted that the public was accustomed to receiving Carvel products through these stores, that the stores were "unique," and that Carvel had a "unique system" of distributing its products. (The agreements are described in more detail in Section II.A., *infra*.) One Carvel newsletter elaborated on this unique system by

---

[2] In particular, no party disputes the district court's ruling that the choice-of-law provisions are broad enough to encompass appellees' claims in both contract and tort.

stating, "[o]f course a customer can go to a supermarket or to a franchise commercial scoop store and pay dearly for commercial storage ice cream brands that are 10 days to 10 months old, but only at Carvel can a customer buy superior premium quality fresh ice cream that is hand made daily." In its publication, *The Carvel Way*, the company further stated that "[t]he Carvel Corporation is in the business of selling franchises to licensees who open a very special store."

Prior to 1992, Carvel never distributed its products through supermarkets. In addition to prohibiting franchisees from doing so, Tom Carvel, himself, repeatedly told graduates of Carvel College that supermarkets were Carvel's primary competition and were the "enemy." However, in 1989, Tom Carvel sold his controlling interest in Carvel to Investcorp. Still, Carvel's new President and CEO, Steve Fellingham, continued to assure franchisees that Carvel was "not in the ice cream manufacturing or the supermarket business and [had] no plans to enter [that] market." Fellingham indicated that a similar strategy had "ruined" Haagen Dazs's retail stores.

B.      Carvel's "Supermarket Program"

Despite those assurances, the company unveiled its "supermarket program" in the early 1990s. In the 1980s, Carvel's franchise stores – and the company in general – had begun to suffer due to competition presented by an increase in frozen desserts being offered in supermarkets, the introduction of frozen desserts at McDonald's, and the growing popularity of frozen yogurt. Carvel commissioned a study on its market decline. This study recommended that Carvel begin selling its products through supermarkets; Carvel accepted the recommendation.

The supermarket program provided that either Carvel sales representatives or franchisees were to secure accounts with supermarket chains. To participate in the program, franchisees had to pay a license fee of $30,000 to $40,000 and had to upgrade their stores to the current design.

If a franchisee chose to participate, it would be assigned a "route" of approximately 30-40 supermarkets. The franchisee would produce ice cream cakes and supply them to the supermarkets, Carvel would bill the supermarkets, and the franchisee would receive the wholesale price minus a ten percent fee to Carvel. If a franchisee chose not to participate, it would still receive a "cooperation payment" equal to five percent of the wholesale sales of Carvel products at supermarkets within a radius of five miles (or a population of 25,000, whichever was less) of its store. Appellant asserts that the program was developed with input from franchisees.

Appellant contends that by selling through supermarkets, Carvel would gain name-recognition and sales at franchise stores would correspondingly *increase*. Appellant also claims that it initially designed the supermarket program with the intention that franchisees would be the primary suppliers of supermarkets. However, by the time of trial, only about 25 percent of supermarkets selling Carvel products were being supplied by franchisees. Indeed, appellees argue that more franchisees sued Carvel over the program than participated in it. Appellees also note that while Carvel was offering franchisees the opportunity to participate in the program, it was contemporaneously building factories from which it could service supermarkets directly. Appellees argue that the supermarket program was simply an "exit strategy" by which Investcorp could sell Carvel at a profit, and that it became obvious that franchises were not part of the company's long-term strategy. From 1993 to 2000, approximately 134 franchise stores went out of business – down to 361 in 2000 – while the supermarket program grew at an annual rate of 40.7 percent. At the Marsella trial, Donald Boroian, an expert franchising consultant, testified that Carvel's supermarket program violated franchising industry standards and practices. Boroian's testimony, which was read into the records at the Giampapa and Noonan trials, also described the supermarket program's sales of Carvel products as "beyond cannibalization," and

6

"the most egregious kind of violation of that franchise relationship you could have." Appellees also claim that Carvel products sold in supermarkets were of inferior quality, causing customer complaints and diminishing Carvel's name.

Further, appellees presented evidence that certain aspects of Carvel's supermarket program not only had adverse consequences for franchisees, but also appeared to be in active competition with them. Carvel would sell products at reduced prices in supermarkets, leading some franchise customers to believe that the franchisees were "gouging" them with higher prices. Carvel issued coupons that it would redeem from supermarkets – but not from franchisees – and printed these coupons on bags that it required franchisees to use in their stores. When a consulting firm advised Carvel to look into the potential impact of the supermarket program on the franchises, Carvel refused and expressly instructed the firm not to examine the issue. At appellee Marsella's trial, a former Carvel sales director testified that Carvel's President once told him, after the director raised the issue of the supermarket program's impact on retail stores, that he "didn't give a f--k about the franchisees."

C.   The Supermarket Program and the Appellees' Franchises

Appellee Marsella testified that Carvel representatives told him that Carvel would "never" sell through supermarkets. Carvel first sold ice cream cakes in supermarkets within eight miles of Marsella's store in 1993; his franchise agreement expired 24 months later.[3] Marsella also testified that Carvel never offered him the opportunity to participate in the supermarket program.

Appellee Giampapa testified that Carvel representatives told him that Carvel would not sell through supermarkets in the franchisees' "back yards" or the states in which the franchisees

---

[3] Marsella's contract expired in October 1995; Noonan's expired in March 1995.

operated. Giampapa then executed a franchise agreement; he testified that he would not have done so if he knew that Carvel would sell through supermarkets in close proximity to his store. Carvel first sold ice cream cakes two towns away from Giampapa's store in mid-1993. Giampapa claims that at least eight supermarkets sold Carvel products "in direct competition" with him.[4]

Noonan testified that Tom Carvel told him Carvel would "never" sell through supermarkets. Carvel first sold ice cream cakes in supermarkets within 10 miles of Noonan's store in March 1994. Appellees claim that at least 12 supermarkets within Noonan's trading area began selling Carvel products. Noonan also testified that Carvel did not offer him the opportunity to participate in the supermarket program. Finally, each appellee testified – and offered expert testimony – that their stores suffered after Carvel instituted its supermarket program.

## II.    Procedural Posture

In November 1994, Carvel brought suit in the United States District Court for the District of Connecticut, seeking a declaratory judgment that its distribution practices did not violate the terms of its franchise agreements. Carvel named as defendants over 50 franchisees. The defendants filed numerous counterclaims for, *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing, and intentional interference with prospective economic

---

[4] Giampapa's contract was due to expire in July, 1998. However, Giampapa purported to unilaterally terminate the contract in August, 1996. He nevertheless continued to operate a retail ice cream store at the same location. Carvel sued, and obtained a judgment against Giampapa. See Giampapa v. Carvel Corp., Bus. Franchise Guide (CCH), ¶ 11,442, aff'd, 187 F.3d 625 (Table) (3d Cir. 1999).

relations.[5] Carvel then moved for summary judgment.

A. The District Court's Rulings on Carvel's Motion for Summary Judgment

In July 1997, the district court ruled on Carvel's motion for summary judgment. See Carvel Corp. v. Baker, 79 F. Supp. 2d 53 (D. Conn. 1997). The court granted only partial summary judgment for Carvel. It denied summary judgment on claims brought under Carvel's older, "Type A" franchise agreements, finding them ambiguous with regard to Carvel's distribution practices. Id. at 59-61. Carvel used Type A franchise agreements until 1992. Prior to signing the agreement, potential franchisees were required to sign a disclosure form stating:

> The Carvel Retail Manufacturer's License is a limited license to manufacture and sell Carvel products at retail only from a Carvel ice cream factory at a specified location approved by the Company, and it expressly provides that as long as the Licensee fully and faithfully performs the obligations of his license, the Company will not establish or license a Carvel retail unit on the same street on which the Licensee's Carvel Ice Cream Factory is situated for a distance of 1/4 mile in either direction on the same street. The Licensee has no other exclusive or territorial rights, and no options or rights with respect to additional Carvel Ice Cream Factories.

Further, Carvel advised prospective franchisees to retain an attorney before signing the franchise agreement. Appellees Marsella and Noonan were Type A franchisees. The agreements that they signed also provided that:

> The parties acknowledge and agree that there has been created a *unique system* for the production, distribution and merchandizing of Carvel products . . .. These high quality products are sold in fine sanitary stores . . . and the public has been accustomed to seek and purchase Carvel products at these unique stores . . ..
> These Carvel Stores operate under the name "Carvel" and under the Carvel

---

[5] Defendants also asserted claims under the New York Consumer Protection Act, N.Y. Gen. Bus. Law § 349 (McKinney 2003), claims for fraudulent concealment, and claims for "franchise malpractice." The district court denied Carvel's motion to dismiss appellees' consumer-protection and fraudulent-concealment claims, and granted it with regard to their franchise malpractice claims. In Marsella's trial, the jury found that Carvel did not violate the New York Consumer Protection Act. It appears that the other appellees did not further pursue that theory.

9

trademarks which cover not only the products manufactured and sold at these unique stores, but also the type of retail store at which the products are sold. . . . The parties further acknowledge and agree that this Agreement provides Licensee only with a limited license to manufacture and sell certain specified Carvel products at retail only . . .. *All other rights in and to the names "Carvel" and the Carvel trademarks are reserved to Carvel* as the owner of that name and those trademarks. [emphasis added]

. . .

So long as Licensee complies with all of the terms of this Agreement, Carvel agrees that it will not establish or license another person to establish a Carvel store on [the same street as the Licensee's store] for the sale of Carvel products, within 1/4 of a mile on said street in either direction from [Licensee's] Carvel store.

The Type A agreement included a comprehensive merger clause, stating that it constituted the entire understanding of the parties.

The district court noted the "reservation of rights" clause in the Type A contract, but "decline[d] to imply from the agreement any right that authorizes Carvel to distribute, at wholesale, ice cream to vendors who are outside the 'unique system' [of distribution]." Id. at 61. The court found that the Type A agreement neither expressly authorized nor forbade Carvel's supermarket program, but concluded that "[i]t is reasonable to presume that the parties intended that the 'unique system' would preclude Carvel from distributing Carvel products, at wholesale, to supermarkets, convenience stores, and other retail locations." Id. at 62. Thus, Type A franchisees were free to bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference.

Although the district court denied Carvel summary judgment with respect to Type A franchisees, it granted Carvel partial summary judgment with respect to franchisees – including Giampapa – who signed newer, "Type B" franchise agreements. See id. at 63-66. In 1992, in response to franchisee complaints that the Type A agreement prohibited Carvel from engaging in

10

its supermarket program, Carvel drafted a new disclosure form and contract. The disclosure form given to appellee Giampapa stated:

> The Carvel Retail Manufacturer's License [is a] limited license [] to manufacture and sell Carvel products at retail only from a Carvel Ice Cream Bakery . . . at a specified location approved by the Company. Such licenses are non-exclusive, and the company, in its sole discretion, has the right to grant other licenses under its trademarks, both within and outside the Licensee's trading area, and to sell or license others to sell products under the Carvel trademark or otherwise through the same or different delivery systems or other channels or concepts. These may include, for example, mail order systems, or outlets located in stadiums, arenas, airports, turnpike rest stops, *supermarkets* and malls. [emphasis added]

The Type B contract also provided that:

> The license granted to Licensees hereunder is non-exclusive, and Carvel, *in its sole and absolute discretion*, has the right (i) to grant other licenses in, to and under the Carvel trademarks in addition to those already granted, both within and outside the Licensee's trading area, (ii) to develop and license other names and trademarks on any such terms and conditions as Carvel deems appropriate, and (iii) to sell or license to sell products under Carvel trademarks or otherwise through the same or *different delivery systems or other distribution channels or concepts*. [emphasis added]

Like the Type A agreement, the Type B agreement included a comprehensive merger clause.

The court found that the Type B agreement, by its express terms, permitted Carvel to sell products through supermarkets. See id. at 64. It thus dismissed Type B franchisees' claims for breach of contract. However, the court held that those franchisees were still free to bring claims for breach of the implied covenant of good faith and fair dealing and for interference with prospective economic relations. See id. at 65-66. With regard to the implied covenant claims, the court noted that it could not "conclude that Carvel [had] exercised its 'absolute discretion . . . [to sell through] other distribution channels reasonably and in good faith." Id. at 66.

B.    The Trials

In June 1998, seven months before the trials began, Carvel moved to dismiss its own

11

complaint without prejudice pursuant to Federal Rule of Civil Procedure ("FRCP") 41(a)(2), and also moved to sever the counterclaims from one another. The district court dismissed the complaint and, rather than severing the counterclaims, ruled that they would be resolved in separate trials pursuant to FRCP 42. The counterclaims filed by appellees Marsella, Giampapa, and Noonan went to trial separately. Ultimately, the juries awarded appellees a total of $439,599 in compensatory damages and a total of $600,000 in punitive damages.

Marsella's case went to trial first. A Type A franchisee, Marsella pleaded two separate claims for breach of contract (selling in supermarkets and selling too close to his store), one claim for breach of the franchise agreement's implied covenant of good faith and fair dealing ("the implied covenant"), and one claim for intentional interference with prospective economic relations ("tortious interference"). On his claim that Carvel's distribution practices breached the franchise agreement to the extent that Carvel sold product in supermarkets, the jury found for Carvel. On his claim that Carvel breached by selling product too close to his store, the jury found for Marsella. And on his claims for breach of the implied covenant and tortious interference, the jury found for Marsella. It awarded him $150,000 in compensatory damages and $50,000 in punitive damages.

Giampapa's trial followed. As Giampapa was a Type B franchisee, and the district court had dismissed his claim for breach of contract, the jury had before it only his claims for breach of the implied covenant and tortious interference. It found for Giampapa on both claims, awarding him $112,000 in compensatory damages and $400,000 in punitive damages.

Noonan's trial came last. As a Type A franchisee, Noonan brought claims for breach of contract, breach of the implied covenant, and tortious interference. The jury found for Noonan

on each claim, awarding $177,599 in compensatory damages and $150,000 in punitive damages.[6]

During each trial, in addition to moving for summary judgment under FRCP 56, Carvel moved for judgment as a matter of law under FRCP 50(a) and 50(b), for a new trial under FRCP 59, and for a reduction in damages.[7] The district court denied the motions. Finally, on October 22, 2002, after having previously entered separate judgments on each verdict, the district court (Covello, *Chief Judge*) entered an overarching final judgment in favor of appellees Marsella, Giampapa, and Noonan. Carvel appeals.

**III.    Analysis**

As noted above, this opinion addresses two aspects of Carvel's appeal. First, with regard to the claims that Carvel tortiously interfered with appellees' prospective economic relations with their retail customers, we ask the New York Court of Appeals to decide whether Carvel's conduct violates the applicable standards for a claim of tortious interference with prospective economic relations and, if necessary, to clarify those standards. Second, with regard to appellees' awards of punitive damages, we ask the New York court to decide whether, as a matter of law, such damages are available in this case. The following analysis offers our reasons for certification and the precise questions presented.

The Local Rules of this Court state that "[w]here authorized by state law, this Court may certify to the highest court of a state an unsettled and significant question of state law that will

---

[6] Carvel contends that the implied covenant claims are actually part of appellees' contract claims and are not separate causes of action. Our characterization of how the district court handled these matters does not imply a view one way or the other as to that contention. That issue must await resolution of the certified questions.

[7] Appellees claim that appellant never moved for judgment as a matter of law on Noonan's claim for breach of contract. However, the record reflects that Carvel moved under FRCP 50(a) at trial, and later renewed that motion under FRCP 50(b).

control the outcome of a case pending before this Court." 2d Cir. R. § 0.27. New York has such a law. Certification is authorized by section 500.17 of the New York Rules of Court, stating that "[w]henever it appears to . . . any United States Court of Appeals . . . that determinative questions of New York law are involved in a cause pending before it for which there is no controlling precedent of the [New York] Court of Appeals, such court may certify the dispositive questions of law to the Court of Appeals." N.Y. Ct. Rules § 500.17(a) (McKinney 2003). Further, we have recognized that "the certification procedure is a valuable device for securing prompt and authoritative resolution of unsettled questions of state law, especially those that seem likely to recur and to have significance beyond the interests of the parties in a particular lawsuit." Kidney v. Kolmar, 808 F.2d 955, 957 (2d Cir. 1987).

### A. Appellees' Claims for Intentional Interference with Prospective Economic Relations

Carvel argues that the district court erred in denying its motion for judgment as a matter of law on appellees' tort claims of intentional interference with prospective economic relations. Recently, a number of courts have had to decide tortious interference claims in a franchisor-franchisee context. The question presents itself whether one party to a *contract* (the franchise agreement) may sue the other in *tort*, where the alleged wrongful conduct of the defendant-franchisor interfered with a (franchisee-customer) relationship whose existence is directly related to the franchise. Although the New York Court of Appeals has not spoken directly on the issue of tortious interference in the franchisor-franchisee context, courts in other states have and they appear to be divided in their approach. In some states, the apparent majority, a franchisee's claim for tortious interference against its franchisor is treated like any other claim against an intervenor in the franchisee's relationship with its customers. Although these courts rarely find that the

franchisee has proven its case, they do not hold the franchisor excluded from tort liability simply by virtue of the franchise contract. See, e.g., Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc., 225 F.3d 876, 886-87 (7th Cir. 2000) (applying Illinois law) (tort actionable, but not proven); Brock v. Baskin Robbins, USA, Co., No. 5:99-CV-274, 2003 WL 21309428, at *6-7 (E.D. Tex. Jan. 17, 2003) (same); Burger King Corp. v. Ashland Equities, Inc., 217 F. Supp. 2d 1266, 1279-80 (S.D. Fla. 2002) (same); Dunkin' Donuts v. Shree Dev Donut LLC, 152 F. Supp. 2d 675, 678-79 (E.D. Pa. 2002) (tort counterclaim survived summary judgment); Harford Donuts, Inc. v. Dunkin' Donuts, Inc., No. Civ. L-98-3668, 2001 WL 403473, at *4-5 (D. Md. April 10, 2001) (tort actionable, but not proven); Clark v. America's Favorite Chicken Co., 916 F. Supp. 586, 594-95 (E.D. La. 1996).

In other states, the apparent minority, courts have added to tortious interference claims the requirement that the tortfeasor be a "third party," or a "stranger," to the interrupted economic relationship. In Cook v. Little Caesar Enterprises, Inc., 210 F.3d 653 (6th Cir. 2000), the court precluded a tort claim brought by a franchisee against its franchisor because "Michigan courts have held that to maintain a cause of action for tortious interference, a plaintiff must establish that defendant was a 'third party' to the contract or business relationship." Id. at 659. And in Britt/Paulk Insurance Agency, Inc. v. Vandroff Insurance Agency, Inc., 952 F. Supp. 1575 (N.D. Ga. 1996), the court precluded suit by an agent against its principal, stating that "Georgia law requires that a plaintiff show that the defendant is a 'stranger' to the business and contractual relations at issue in order to prevail on tortious interference with business and contractual relations claims." Id. at 1584. Presumably, this requirement is meant to prevent the encroachment of tort into contract disputes.

Carvel relies heavily on the fact that this case presents tortious interference claims by

15

parties with whom it had contractual relationships. Although New York courts have not addressed the specific issue of whether tortious interference will lie between franchisor and franchisee, they have addressed the more general issue of when a tort will lie between parties to a contract. Where the plaintiff and defendant are parties to a contract, and the plaintiff seeks to hold the defendant liable in tort, the plaintiff must prove that the defendant breached a duty "independent" of its duties under the contract; otherwise plaintiff is limited to an action in contract. In Clark-Fitzpatrick Inc. v. Long Island R.R. Co., 70 N.Y.2d 382 (1987), the court stated, "[i]t is a well established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." Id. at 389 (citations omitted). Similarly, in Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50 (1st Dep't 1988), the court explained, "unless the contract creates a relation, out of which relation springs a duty, independent of the mere contract obligation, though there may be a breach of the contract, there is no tort, since there is no duty to be violated." Id. at 55 (quotation marks and citation omitted). Of course, determining whether one violated such an "independent" duty is a complex task. The New York Court of Appeals has explained that:

> Between actions plainly *ex contractu* and those as clearly *ex delicto* there exists what has been termed a border-land, where the lines of distinction are shadowy and obscure, and the tort and the contract so approach each other, and become so nearly coincident as to make their practical separation somewhat difficult. . . . [Commentators have described a tort] in general as "a wrong independent of contract." And yet, it is conceded that a tort may grow out of, or make part of, or be coincident with a contract, and that precisely the same state of facts, between the same parties, may admit of an action either *ex contractu* or *ex delicto*. In such cases the tort is dependent upon, while at the same time independent of the contract; for if the latter imposes a legal duty upon a person, the neglect of that duty may constitute a tort founded upon a contract.

Rich v. New York Cent. & H.R.R. Co., 87 N.Y. 382, 390 (1882) (italics added and citations to treatises omitted).

16

That parties to a contract may not sue each other in tort absent a violation of an "independent duty" implies the proposition that if a party to a contract *does* violate an "independent duty," it *may* be liable in tort. When a defendant breaches its contract with a plaintiff, that defendant may also breach an independent duty in tort if the defendant goes beyond a mere breach of the contract and acts in such a way that a trier of fact could infer that it willfully intended to harm the plaintiff. In Albermarle Theatre Inc. v. Bayberry Realty Corp., 27 A.D.2d 172 (1st Dep't 1967), the plaintiff-landlord rented a movie theatre to the defendants. Pursuant to the lease, the defendants were obligated to display only "first run" motion pictures in order to preserve the value of the plaintiff's well-established theatre. The defendants, however, ran lesser quality films, improperly operated the theatre, and thus drove down the value of the plaintiff's property. The plaintiff alleged that these acts were done with the intention that the defendants' own theatre locations, which competed with plaintiff's theatre, would prosper. The court held that the defendants' alleged conduct supported causes of action in both tort and contract. It held that the defendants' conduct "constituted not only a breach of [defendants'] contract with the plaintiff, but a violation of their legal common-law duty extraneous to the contract not to act willfully to destroy the property of another, including the plaintiff." Id. at 177.

In the present case, the contract that ran between appellees and Carvel happened to be a franchise agreement. Absent some reason to think that New York courts would treat franchise agreements differently than other contracts, we would apply the general "independent duty" rule to the specific case of the franchisor-franchisee relationship. Carvel argues that appellees simply recast their breach of contract claims as tort claims, presumably in order to obtain punitive damages. Carvel thus argues that appellees did not allege the violation of a duty "independent" of the franchise agreement. Appellees counter that Carvel breached just such an independent

17

duty – the duty to not interfere with their prospective contractual relations and thereby destroy their businesses. This was not an obligation explicitly bargained for in the franchise agreements. It is a duty in tort, owed independently of the existence of the agreements.

Appellees argue that Carvel instituted the supermarket program with full knowledge that doing so would damage appellees' relationships with their customers. Before the supermarket program began, Steve Fellingham, Carvel's President and CEO, stated that Carvel had no intention of entering that market because a similar strategy had "ruined" Haagen Dazs retail stores. At Marsella's trial, a former Carvel sales director testified that Carvel's President once told him, after the director raised the issue of the supermarket program's impact on retail stores, that he "didn't give a f--k about the franchisees." When a consulting firm advised Carvel to look into the potential impact of the supermarket program on the franchises, Carvel refused and expressly instructed the firm not to do so. Appellees also point to the coupon program as a deliberate attempt by Carvel to give supermarkets a competitive advantage in selling Carvel products for Carvel's direct gain, at the cost of its franchisees. From this evidence, the juries could reasonably have concluded that Carvel did not merely violate an express or implied obligation entailed in the franchise agreements, but that Carvel went further, violating an independent duty in tort by willfully causing damage to appellees prospective business relationships.[8]

The next issue to resolve is whether appellees have established the elements of a claim for tortious interference. This Court has stated that, to prevail on such a claim, a plaintiff in

---

[8] We have chosen not to add to the Court of Appeals' burden by requesting that the New York court also tell us if New York would adopt a "stranger to the contract" requirement in tortious interference cases in general or, more specifically, as to the claims between a franchisor and its franchisees. Certainly, the Court of Appeals can choose to do so if it sees fit in resolving the questions we have posed.

New York must prove that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. See Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997); Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994). However, the status of the third element of this claim, as applied to this case, is unclear under New York law. And the standard by which we must evaluate Carvel's conduct is at the heart of appellees' claims.

The tort of intentional interference with prospective economic relations is relatively simple to understand in theory – but notoriously complicated in practice. The idea behind the tort is that A claims that C interfered with A's prospective economic relationship with B. Often, C is a market competitor of A, and thus C's actions are aimed at luring B away from A, so that C, itself, can enter into an economic relationship with B. But sometimes C is simply an interloper in the affairs of A and B, acting with the primary purpose of injuring A. Thus, the central tension in such cases is in drawing the line between permissible market behavior and impermissible predatory behavior. See generally Harvey S. Perlman, Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine, 49 U. CHI. L. REV. 61 (1982) (proposing that defendants be liable only where their conduct is independently unlawful). Not surprisingly, though, the inherently subjective basis of this distinction, and its economic implications, make the practical application of this tort a daunting task. See id. at 61-62. As the New York Court of Appeals has noted, the difficulty lies in "achiev[ing] a balance of the protection of the interests of the one party in future enjoyment of contract performance and society's interest in respect for the integrity of contractual relationships, on the one hand, and, on the other, the right to freedom of action on the part of the party interfering and society's concern

that competition not be unduly hampered." Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 190 (1980).

The Restatement (Second) of Torts attempts to demark the line between permissible and tortious conduct by suggesting that liability should obtain only where the tortfeasor (C) acted, at a minimum, "improperly." RESTATEMENT (SECOND) OF TORTS § 766B [hereinafter RESTATEMENT]. It first distinguishes between interference with existing contracts and interference with prospective economic relations. Regarding existing contracts, it states that liability will attach to one who "intentionally and *improperly* interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract." RESTATEMENT § 766 (emphasis added).

Regarding interference with prospective economic relations claims – and only this latter type of claim – the Restatement further distinguishes between generic instances of interference and those special (although more frequently encountered) instances in which the plaintiff and defendant are market competitors. If the plaintiff claims that a non-competitor interfered with its prospective economic relations, then the Restatement suggests that the defendant should be liable where its interference was merely "improper." Id. § 766B. The factors in determining whether interference is improper include the nature of the defendant's conduct, the defendant's motive, the interests of both parties, the social interests in competition and the sanctity of contract, the degree to which the defendant's conduct caused the interference, and the relationship between the parties. See id. § 767. In further defining the "nature of defendant's conduct" factor, the commentary to § 767 lists several different examples of improper conduct. See id. at cmt. *c*. Of particular relevance to this case is the specific suggestion that a defendant's conduct is improper when it is in "[v]iolation of recognized ethical codes for a particular area of business activity or

20

of established customs or practices regarding disapproved actions or methods." Id.

However, if the plaintiff claims that a *competitor* interfered with its prospective economic relations – which, according to the Restatement, requires a "special application of the factors determining whether an interference is improper or not," id. at cmt. *b* – then the Restatement counsels that liability should only obtain where the defendant "employ[ed] wrongful means." Id. § 768. Wrongful means include a subset of the "improper" conduct listed in the § 767 commentary: "physical violence, fraud, civil suits and criminal prosecutions." Id. at cmt. *e*. The Restatement's distinction between competitors and non-competitors is intended to strike a balance between protecting economic relationships and encouraging competitive behavior in the market. Interference with prospective economic relations is, one might argue, the *sine qua non* of competition – and thus should bring liability only where the conduct is highly reprehensible.

New York courts have recognized the tort of intentional interference with prospective economic relations, but it is somewhat unclear whether they have adopted the distinction, reflected in the Restatement, between cases in which the plaintiff and defendant are market competitors and cases in which they are not. In the former, New York clearly requires a plaintiff to demonstrate that the defendant acted "wrongfully." In NBT Bancorp, Inc. v. Fleet/Norstar Financial Group, Inc., 87 N.Y.2d 614 (1996), the New York court affirmed the dismissal of a tortious interference claim, where the plaintiff and defendant were competing over the acquisition of a corporation, because plaintiff had produced insufficient evidence that defendant used "wrongful means." Id. at 624-25. In doing so, the court relied on its earlier decision, Guard-Life, which adopted the Restatement's view of tortious interference with prospective economic relations between market competitors. In Guard-Life, the court stated that "'wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal

21

prosecutions, and some degrees of economic pressure; they do not however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract." Guard-Life, 50 N.Y.2d at 191.

Where the plaintiff and defendant are *not* competitors, however, it is unclear whether the New York Court of Appeals would hold a defendant liable under the less stringent improper-conduct standard. In Guard-Life, the court had before it claims of tortious interference brought by one competitor against another. Id. at 187. The plaintiff asserted claims for both interference with contract and interference with prospective economic relations. Id. at 189. In setting forth the applicable law, the court first quoted § 766 of the Restatement for the proposition that one is subject to liability for interference with *contract* where one acts "improperly." Id. at 189. The court then turned to the issue of what law applies where a competitor interferes with *prospective* economic relations and adopted the Restatement's wrongful-means standard. Id. at 190-191 (quoting RESTATEMENT § 768). However, because, as was the case in NBT Bancorp, the court was analyzing claims for tortious interference brought by one *competitor* against another, it never spoke to the issue of what standard applies to a non-competitor that interferes with prospective economic relations. See Guard-Life, 50 N.Y.2d at 187-90; NBT Bancorp, 87 N.Y.2d at 621. It never adopted § 766*B*. That the court applied the more stringent "wrongful means" standard to the competitor-defendant before it does not conclusively demonstrate that it would apply the less stringent improper-conduct standard to a non-competitor.

In sum, the Restatement envisions four possible factual scenarios, and announces a rule for each. First, where a non-competitor interferes with an existing contract, it is liable so long as its conduct was at least "improper." RESTATEMENT § 766. Second, where a competitor interferes with an existing contract, the same rule obtains. Id. § 768 cmt. *a*. Third, where a non-

22

competitor interferes with prospective economic relations, it is also liable so long as it acted "improperly." Id. § 766B. Fourth, where a competitor interferes with prospective economic relations, it is liable only if it utilized "wrongful means." Id. § 768. The New York Court of Appeals has had the opportunity to address all but the third of these rules.

Further, even were it clear that New York would apply differing standards to competitors and non-competitors in a case for interference with prospective economic relations, it is unclear which standard it would apply in the present case. Although New York has recognized the tort in question, it has not had the opportunity to analyze it in the franchisor-franchisee context. At least one aspect of such a suit – where a franchisee claims that its franchisor interfered in the relationships between the franchisee and its customers – sets it apart from traditional suits for tortious interference: one would not normally consider a franchisor a *competitor* of its franchisee.[9] In this case, Carvel has perhaps inconsistently contended both that its supermarket program was intended to benefit its franchisees *and* that it should be free from liability because, in selling products through supermarkets, it merely engaged in "competition for customers" with those same franchisees. While it seems plain that Carvel did, indeed, compete with its franchisees, it is unclear whether Carvel – a contractual "partner" with those franchisees–should be given the benefit of requiring appellees to show that its conduct was "wrongful," and not merely "improper."

_____

[9] An additional distinguishing aspect of such a suit is that it encompasses not merely the economic relationship between the plaintiff and third parties (its customers), but also the contractual relationship between the franchisor and the franchisee. In this context, added to the existing tension between market competition and predatory behavior is the tension between contract and tort. Thus, the franchise contract may play a role in assessing the policy implications of permitting recovery in *tort*. See supra pages 15-19. This issue is central in the second question we certify to the New York court–that of the availability of punitive damages. See infra Section III.B.

Moreover, once it is determined by which standard we should evaluate Carvel's conduct, we have little guidance with which to conduct that evaluation. As noted above, the Restatement suggests that one consideration in determining whether a defendant used improper means is whether it engaged in a "[v]iolation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods." RESTATEMENT § 767 cmt. *c*. Appellees introduced expert testimony that Carvel's supermarket program represented "the most egregious kind of violation of [a] franchise relationship that you could have." Appellees thus provided the jury with evidence that Carvel "[v]iolated . . . established customs or practices" of franchising. Id. However, although Carvel violated franchising standards, no New York court has endorsed that aspect of the Restatement's definition of "improper" means.

Similarly, if New York would treat Carvel and its franchisees as "competitors" for purposes of this case, it is unclear whether Carvel's conduct rose to the level of "wrongful." Carvel argues that even if it interfered with appellees' relationships with their customers, it did not do so by "wrongful means."[10] As noted above, even conduct that would otherwise be legitimate business competition may be tortious if the defendant used "wrongful means." See NBT Bancorp, 87 N.Y.2d at 623-24; see also RESTATEMENT § 768 cmt. *e* (stating that the "wrongful means" may preclude the defense of "competition"). In defining this standard, the New York Court of Appeals has stated that "'[w]rongful means' include physical violence, fraud

---

[10] In its Brief, Carvel argues that appellees' had the burden of proving either that Carvel's sole intent was to harm them, or that Carvel acted criminally or fraudulently. Carvel here relies on a statement in PPX Enterprises Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266 (2d Cir. 1987). However, this Court subsequently held that the relevant language in PPX was dicta that "would appear unduly narrow, inasmuch as the New York Court of Appeals subsequently reiterated the Guard-Life standard (which encompasses a considerably wider range of conduct) in NBT Bancorp." Hannex Corp. v. GMI, Inc., 140 F.3d 194, 206 n.9 (2d Cir. 1998).

or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the [prospective] contract." Guard-Life, 50 N.Y.2d at 191. However, "'some degrees of economic pressure' has not been [further] defined by the New York courts." Scutti Enter., LLC v. Park Place Entm't Corp., 322 F.3d 211, 216 (2d Cir. 2003). Nevertheless, in Scutti, this Court dealt directly with the issue of whether a defendant's conduct rose to a level of economic pressure properly characterized as "wrongful" for the purpose of imposing liability for tortious interference with economic relations. Our court noted that the Restatement provides the following guidance:

> The question whether this pressure is proper is answered in the light of the circumstances in which it is exerted, the object sought to be accomplished by the actor, the degree of coercion involved, the extent of the harm that it threatens, the effect upon the neutral parties drawn into the situation, the effects upon competition, and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective.

Id. at 216 (quoting RESTATEMENT § 767 cmt. *c*).

Appellees argue that Carvel's differential setting of prices and its refusal to redeem coupons that it required franchisees to distribute constituted wrongful "economic pressure" on the franchisees. Although differential pricing is squarely in the realm of legitimate competitive behavior, Carvel's refusal to redeem coupons from the franchisees is more difficult to accept. Carvel had the power to require franchisees to distribute the coupons. In redeeming those coupons only from the franchisees' new "competitors" – the supermarkets – Carvel effectively forced the franchisees to be the instrument of their own undoing. At least with regard to these coupons, "the degree of coercion involved, [and] the extent of the harm that it threaten[ed]" compellingly suggest that Carvel's conduct rose to the level of "wrongful" for purposes of tort

25

liability. Id. Indeed, it calls into question "the general reasonableness and appropriateness of [Carvel's economic] pressure as a means of accomplishing [its] objective." Id.

To the extent that this Court might anticipate that the New York court would adhere to the *Restatement's* view of "wrongful means," appellees have presented evidence of such means here. However, this argument has little mooring in New York case law and suggests that it would be appropriate to ask the New York Court of Appeals for an evaluation of Carvel's conduct. Although Carvel exerted economic pressure on its franchisees, it is unclear whether, under New York law, that pressure falls within the "degrees" of pressure that constitute tortious conduct. We ask the New York Court of Appeals to clarify the issue.

In deciding whether to certify questions to a state high court, this Court not only looks to the extent of existing state precedent, but also scrutinizes the nature of the questions to be asked. For example, in Engel v. CBS, Inc., 145 F.3d 499 (2d Cir. 1998), this Court found a question "appropriate for resolution by the New York Court of Appeals because of the lack of authoritative guidance on an issue with significant impact on New York tort law." Id. at 505. In Engel, an attorney brought suit against his client's adversary for malicious prosecution, claiming that the defendant wrongfully commenced an action against him in order to disrupt his representation of his client. Id. at 500. The district court granted the defendant's motion for summary judgment on the ground that the plaintiff had not established one of the elements of malicious prosecution: "special injury." Id. at 501. The plaintiff appealed to this Court, arguing that New York law does not require a plaintiff to show "special injury," and, alternatively, that even if New York law does require such a showing, he had shown it in this case. Id. at 501-02.

On appeal, this Court first explained that, under New York law, a plaintiff claiming malicious prosecution must show "1) the initiation of an action by the defendant against [him], 2)

26

begun with malice, 3) without probable cause to believe it can succeed, 4) that ends in failure, or, in other words, terminates in favor of the plaintiff." Id. at 502. The Court further noted that "if the proceeding of which plaintiff complains was a civil action, the plaintiff must prove special injury – some interference with [the] plaintiff's person or property . . . beyond the ordinary burden of defending a lawsuit." Id. (internal quotation marks and citation omitted). Having rejected the plaintiff's theory that New York law does not require a showing of "special injury," this Court then turned to the question of whether the plaintiff had proven facts sufficient to establish that he had suffered such a "special injury."

In examining whether the plaintiff in Engel had established the element of "special injury," this Court noted that, although in many cases plaintiffs have shown "special injury" by showing that the defendant utilized provisional remedies such as arrest, attachment, replevin, and injunction, "[t]he New York Court of Appeals [had] not clarified whether, and to what extent, interference with person or property, other than through provisional remedies, might satisfy the special injury requirement." Id. The Court therefore certified the question to the New York Court of Appeals, stating that "[a] determination of this issue by the Court of Appeals will provide this and other courts with a clear standard to apply in actions for malicious prosecution under New York law." Id. at 505. Upon receipt of the certified question, the New York Court of Appeals noted that the question "assumes the existence of the special injury requirement and focuses on what adverse consequences resulting from a civil suit could amount to a special injury." Engel v. CBS, Inc., 93 N.Y.2d 195, 198 (1999). With that focus, the New York court held that the consequences of the defendant's conduct did not "constitute such special injury." Id. at 199.

The present case both meets the basic standards for certifying a question to the New York

27

Court of Appeals and is an appropriate case in which to do so. Whether New York would distinguish between competitors and non-competitors in a case for tortious interference with prospective economic relations, and whether Carvel's conduct constituted "improper" or "wrongful means," will "control the outcome" of appellees' claim for tortious interference. 2d Cir. R. § 0.27. Further, although the Restatement suggests that a violation of industry standards is "improper" conduct, RESTATEMENT § 767 cmt. *c*, and the New York Court of Appeals has stated that "some degrees of economic pressure" rise to the level of "wrongful," Guard-Life, 50 N.Y.2d at 191, there is "no controlling precedent" from the New York court as to either the contours of "improper" conduct or what sort of economic pressure constitutes "wrongful means." N.Y. Ct. Rules § 500.17(a). Specifically, "'some degrees of economic pressure' has not been defined by the New York courts." Scutti, 322 F.3d at 216.

The similarities between the present case and Engel are also instructive. Engel involved an issue with "significant impact on New York tort law." Engel, 145 F.3d at 505. The determination of at what point a franchisor's economic pressure on its franchisees becomes tortious will have a similar impact. In Engel, this Court recognized that the tort of malicious prosecution requires a showing of "special injury" and yet asked the New York court to give content to that phrase by deciding whether the consequences of the defendant's conduct "might satisfy the special injury requirement." Id. at 502. Here, although it is clear that "wrongful means" – and, in particular, "wrongful economic pressure" – can ground liability for a competitor's interference with prospective economic relations, it is unclear just what sort of conduct constitutes those means. In sum, this Court should once again give the New York Court of Appeals the opportunity to articulate a "clear standard to apply in actions . . . under New York [tort] law." Id. at 505. We therefore certify the following question:

28

**Under applicable standards for a claim of tortious interference with prospective economic relations, did the evidence of the franchisor's conduct in each of the three trials on review in these consolidated appeals permit a jury finding in favor of the franchisee? In answering this question, the Court of Appeals might wish to inform us whether, in the context of a tortious interference claim, New York would view the franchisor in this case as a competitor of the franchisees for purposes of determining the applicable standard, and, if so, whether a plaintiff must show that a competitor-defendant acted "wrongfully" but show that a non-competitor defendant acted only "improperly."**

B.     Appellees' Punitive Damages Awards

Carvel argues that the district court erred in allowing the juries to award punitive damages. Carvel correctly notes that, if appellees' tort claims fail, then they are not entitled to punitive damages. But Carvel also argues that, even if appellees' tort claims survive, the district court erred in permitting the juries to award punitive damages. To obtain punitive damages in ordinary tort actions, a New York plaintiff not only must show that the defendant committed a tort, but also must demonstrate the existence of "circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called wilful or wanton." Prozeralik v. Capital Cities Communications, Inc., 82 N.Y.2d 466, 479 (1993) (quoting PROSSER AND KEETON, TORTS § 2, at 9-10 (5th ed. 1984)). This Court has permitted punitive damages in tortious interference cases involving New York claims. See, e.g., Queenie, Ltd. v. Nygard Int'l, 321 F.3d 282, 284 (2d Cir. 2003) (affirming punitive damages award); Purgess v. Sharrock, 33 F.3d 134, 142 (2d Cir. 1994) (citing Guard-Life, 50 N.Y.2d at 197, for the proposition that "[i]n an action against a third party for tortious interference, . . . the elements of damages would be those recognized under the more liberal rules applicable to tort actions").

Although it seems clear that a jury may award punitive damages in an ordinary claim for

intentional interference with economic relations, see Purgess, 33 F.3d at 142, this case does not entail an *ordinary* claim. Here Carvel was not merely a competitive interloper in the affairs of the plaintiffs; Carvel was also in a contractual relationship with the plaintiffs. The issue arises, then, whether punitive damages are appropriate in this case, given that the appellees' claims – including their tort claims – relate in one way or another to their contractual relationship with Carvel.

Of course, it is hornbook law that punitive damages are unavailable in ordinary contract actions. However, in New York, plaintiffs may sometimes obtain punitive damages in actions presenting mixed issues of contract and tort. In New York University v. Continental Insurance Co., 87 N.Y.2d 308 (1995) [hereinafter NYU], the New York Court of Appeals addressed the question of whether punitive damages were proper in the plaintiff's fraud claim against an insurance company. The plaintiff sued for breach of contract *and* claimed that the insurance company fraudulently "represent[ed] that it would evaluate claims in good faith." NYU, 87 N.Y.2d at 317. The court, drawing on Rocanova v. Equitable Life Assurance Soc., 83 N.Y.2d 603 (1994), explained:

> [T]he pleading elements required to state a claim for punitive damages as an additional and exemplary remedy when the claim *arises from a breach of contract* [are] (1) defendant's conduct must be actionable as an independent tort; (2) the tortious conduct must be of the egregious nature set forth in [prior caselaw]; (3) the egregious conduct must be directed to plaintiff; and (4) it must be part of a pattern directed at the public generally.

NYU, 87 N.Y.2d at 316 (emphasis added). Carvel argues that New York's unique contract-punitives standard applies to tortious interference claims in a franchise context because those claims "arise from" a contractual relationship. According to Carvel, then, even if appellees have successfully shown that it egregiously directed tortious conduct toward them, they have not

proven that Carvel directed such conduct at the public generally. Thus appellees are not entitled to punitive damages.

If Carvel is correct that this dispute comes within the guidance of NYU, then appellees' punitive damages awards were improper. Appellees have made no showing of "public harm." But it is unclear whether appellees' claims are controlled by that standard. Carvel is correct that but for the existence of its franchise agreement with appellees, this particular dispute would likely never have arisen. Indeed, the most egregious aspect of Carvel's behavior – its compelling appellees to provide customers with coupons to be used at supermarkets – *could not* have occurred if Carvel was not in the contractual position to require its franchisees to do so. Under this view, appellees' tortious interference claims "arise from" a contract dispute, and the NYU standard applies.[11]

New York courts have applied the "public harm" standard only to cases in which the defendant's allegedly tortious conduct was directly related to the contract between the plaintiff and defendant. That is, the typical fact pattern in which New York courts apply this standard is

_____

[11] Appellees make much of this Court's recent affirmance of Queenie, Ltd. v. Nygard Int'l, 204 F. Supp. 2d 601 (S.D.N.Y. 2002), aff'd, 321 F.3d 282 (2d Cir. 2003). There, the district court asserted that the suggestion "that punitive damages may not be awarded under New York law unless the alleged tortious conduct is aimed at the general public and not solely a private party . . . is flatly wrong and a misreading of the relevant case law. Such a limitation on punitive damages applies in breach of contract cases, but not in tort cases." Id. at 605 n.3. Similarly, in Don Buchwald & Associates, Inc. v. Rich, 281 A.D.2d 329 (1st Dep't 2001), a New York court rejected the "public harm" standard in a tortious interference case, characterizing the case as one involving breach of fiduciary duty, and stating that "[t]he limitation of an award for punitive damages to conduct directed at the general public applies only in breach of contract cases, not in tort cases for breach of fiduciary duty." Id. at 330. Appellees argue that, because they asserted a tort claim, whether they are entitled to punitive damages is determined according to the "rules applicable to tort actions." Purgess, 33 F.3d at 142. Therefore, they argue, the "public harm" standard does not apply to their tortious interference claims. However, this argument ignores the relevant difference between this case and Nygard; in Nygard, the plaintiff and defendant were not themselves parties to a contract.

31

where the plaintiff claims that the defendant fraudulently misrepresented something about the contract between the two. See, e.g., NYU, 87 N.Y.2d at 316-17; Rocanova, 83 N.Y.2d at 616-17; Rochelle Assocs. v. Fleet Bank of N.Y., 230 A.D.2d 605, 606 (1st Dep't 1996); Franco v. English, 210 A.D.2d 630, 635 (3d Dep't 1994). In the present case, however, appellees do not claim that Carvel acted tortiously with regard to the contract between appellees and Carvel. Rather, appellees claim that Carvel acted tortiously with regard to the relations between appellees and their customers. In this sense, then, the existence of the franchise agreement running from appellees to Carvel might be considered *incidental* to appellees' tort claim. That is, the existence of appellees' franchise agreements was not – at least in principle – *necessary* for this dispute to have arisen; absent the agreements, Carvel could have tortiously interfered with the appellees' economic relations in some ways. Under the understanding that Carvel could have interfered with appellees' relationship with their customers in the absence of franchise agreements, appellees' case does not necessarily "arise from" a contract dispute; it arises from the extra-contractual conduct of Carvel.

As noted previously, in deciding whether to certify questions to a state high court, this Court looks to both the extent of existing state precedent and the nature of the questions to be asked. In particular, whether to certify a question depends to some extent upon "whether the question implicates issues of state public policy." Krohn v. N.Y. City Police Dep't, 341 F.3d 177, 180 (2d Cir. 2003). For example, in Home Insurance Co. v. American Home Products Corp., 873 F.2d 520 (2d Cir. 1989), this Court certified a question to the New York Court of Appeals as to whether New York public policy precluded insurance coverage of out-of-state punitive damages awards. Id. at 522. After finding "no New York case that either applies or refuses to apply New York's public policy to the insurability of out-of-state punitive damage

32

judgments," the Court certified the question.  Id.  In doing so, it stated:

> This question, one of first impression, should be decided by the New York court because it directly involves the application of an important public policy of the State of New York.  Punitive damages can obviously be awarded in any of a great number of states against persons who are insured under New York law.  Awards of punitive damages in increasingly large amounts are becoming more frequent and the question of whether New York State would require an insurer to reimburse an insured for such damages obtained in an out-of-state judgment will undoubtedly recur.  The question is of obvious importance to the insurance industry and to those who buy insurance policies.  There is no precedent on the issue now and New York has a strong interest in deciding the issue certified rather than having the only precedent on point be that of the federal court, which may be mistaken.

Id.

Here, as in Home Insurance, this Court is presented with the question of whether New York law permits punitive damages awards.  More specifically, the issue that will "control the outcome" of arguably the most pressing aspect of this case is whether a franchisee suing its franchisor in *tort* must prove that the franchisor directed its tortious conduct "at the public generally" in order to obtain punitive damages.  NYU, 87 N.Y.2d at 316.  The answer to that question has important public policy implications.  Just as the answer in Home Insurance was of "obvious importance to the insurance industry and to those who buy insurance policies," Home Ins., 873 F.2d at 522, the answer here could greatly impact franchisor-franchisee relationships controlled by New York law.  Indeed, in NYU, the New York Court of Appeals indicated its concern over awarding punitive damages in cases involving mixed issues of tort and contract.  However, given the lack of a "New York case that either applies or refuses to apply" punitive damages in the franchisor-franchisee context, id., this Court lacks guidance in the present case.  In particular, this Court lacks guidance as to whether appellees' case "arises from" a contractual relation.  And given that "there are at least two possible and conflicting views of New York law"

33

on how this Court should apply New York's contract-punitives standard, <u>Gilbert v. Seton Hall Univ.</u>, 332 F.2d 105, 114 (2d Cir. 2003) (Sotomayor, *J.*, dissenting from majority's decision not to certify a question), this Court should allow the New York Court of Appeals to resolve the issue. We therefore certify the following question:

> **Is public harm required for a punitive damages claim by a franchisee against its franchisor for tortious interference with the franchisee's prospective economic relations with its customers?**

## IV. Conclusion

For the reasons stated, we certify the above questions to the New York State Court of Appeals. If the New York court holds that Carvel's conduct was tortious by the appropriate state-law standard, then this court need not reach the remaining contract issues, and will only have to address Carvel's contention that appellees relied on an incorrect measure of compensatory damages. This is so regardless of the New York court's ruling on punitive damages because, if appellees are entitled to their compensatory damages under the tort claims, it is irrelevant whether they prevail on contract claims carrying the same damages. However, if the New York court holds that Carvel's conduct was not tortious by the appropriate state-law standard, then two things follow. First, it follows that punitive damages were wrongly awarded.[12] Second, it follows that, as Carvel would not be liable in tort, this Court would then have to resolve the remaining contract and compensatory damages issues. Of course, if the New York Court of Appeals deems it appropriate to address any other issues of New York law it feels are essential in resolving the issues presented by the certified questions, it is free to do so. Barring that, and upon receipt of the New York court's answer to the above questions, we will resolve the

---

[12] This is so because (1) they could not have been awarded on appellees' non-viable tort claim, and (2), without an "actionable" tort, they could not have been awarded on appellees' contract claims. <u>NYU</u>, 87 N.Y.2d at 316.

remaining issues as needed.